No. 23-2376

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

—————————————

AXALTA COATING SYSTEMS LLC
Petitioner,
v.

FEDERAL AVIATION ADMINISTRATION,

Respondent.

—————————————

On Petition for Review from a Final Order of the
Federal Aviation Administration

—————————————

## RESPONDENT'S ANSWERING BRIEF

—————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

JOSHUA M. SALZMAN
DANIEL AGUILAR
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5432*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION .................................................. 2

STATEMENT OF THE ISSUES ....................................................... 2

STATEMENT OF THE CASE ........................................................... 3

I.    Statutory and Regulatory Background ................................... 3

II.    Factual Background and Prior Proceedings ........................... 9

SUMMARY OF ARGUMENT ........................................................ 14

STANDARD OF REVIEW ............................................................. 18

ARGUMENT .................................................................................. 18

I.    Congress Constitutionally Regulated the Transportation of
Hazardous Materials and Authorized the Secretary to
Adjudicate Violations and Impose Civil Penalties ............... 18

      A.    Seventh Amendment Framework ............................... 19

      B.    Axalta's Violations of the Hazardous Materials
Transportation Act Do Not Derive From the Common Law
and Instead Concern Public Rights ........................... 22

II.    Congress Constitutionally Directed Executive Enforcement of
the Hazardous Materials Transportation Act ...................... 33

III.    The Secretary Constitutionally Appointed the ALJ ............ 38

IV.    Axalta's Challenge To ALJ Removal Restrictions Fails ..... 40

      A.    Congress Constitutionally Provided that ALJs May Be
Removed for "Good Cause" ...................................... 41

      B.    Axalta Fails to Demonstrate Any Prejudice From the
             Challenged Removal Restrictions ............................................48

V.    The Enforcement Action is Timely ....................................................49

VI.   The Agency Decision is Supported by Substantial Evidence,
      Reasonably Explained, and Consistent with Law ..............................52

CONCLUSION..............................................................................................60

COMBINED CERTIFICATIONS

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aloha Airlines, Inc. v. Civil Aeronautics Board,*
    598 F.2d 250 (D.C. Cir. 1979) ................................................................ 54

*American Chemistry Council v. Department of Transportation,*
    468 F.3d 810 (D.C. Cir. 2006) ........................................................ 30-31

*Baldwin v. New York,*
    399 U.S. 66 (1970) ................................................................................ 37

*Calcutt v. FDIC,*
    37 F.4th 293 (6th Cir. 2022) ........................................................ 40, 45, 49

*CFPB v. Law Offices of Crystal Moroney, P.C.,*
    63 F.4th 174 (2d Cir. 2023) ................................................................. 49

*CFPB v. National Collegiate Master Student Loan Trust,*
    96 F.4th 599 (3d Cir. 2024) ........................................................... 17, 48

*Collins v. Yellen,*
    594 U.S. 220 (2021) ......................................................................... 17, 48

*Contact Courier Services, Inc. v. Research & Special Programs Administration,*
    924 F.2d 112 (7th Cir. 1991) ................................................................ 56

*Crowell v. Benson,*
    285 U.S. 22 (1932) ................................................... 20, 26, 27, 28

*Curtis v. Loether,*
    415 U.S. 189 (1974) ............................................................................. 32

*David Stanley Consultants v. Director, Office of Workers' Compensation Programs,*
    800 F. App'x 123 (3d Cir. 2020) ........................................................ 35

*Decker Coal Co. v. Pehringer,*
    8 F.4th 1123 (9th Cir. 2021) ....................................................... 40, 45, 47

*Dinnall v. Gonzales,*
  421 F.3d 247 (3d Cir. 2005) .................................................................. 18

*Edd Potter Coal Co. v. Director, Office of Workers' Compensation Programs,*
  39 F.4th 202 (4th Cir. 2022) ................................................................ 35

*Edmond v. United States,*
  520 U.S. 651 (1997) ....................................................................... 38, 39

*Ex parte Bakelite Corp.,*
  279 U.S. 438 (1929) ............................................................. 15-16, 27, 35

*FERC v. Powhatan Energy Fund, LLC,*
  949 F.3d 891 (4th Cir. 2020) ................................................................ 51

*FERC v. Vitol Inc.,*
  79 F.4th 1059 (9th Cir. 2023) .......................................................... 51, 52

*Fleming v. U.S. Department of Agriculture,*
  987 F.3d 1093 (D.C. Cir. 2021) ........................................................... 35

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
  561 U.S. 477 (2010) ........................................................... 42, 43, 46, 47

*Gabelli v. SEC,*
  568 U.S. 442 (2013) ........................................................................... 51

*Gonnella v. SEC,*
  954 F.3d 536 (2d Cir. 2020) ................................................................ 35

*Granfinanciera, S.A. v. Nordberg,*
  492 U.S. 33 (1989) ..................................................... 15, 19, 20, 21, 26

*Gundy v. United States,*
  588 U.S. 128 (2019) ........................................................................... 36

*Houston v. St. Louis Independent Packing Co.,*
  249 U.S. 479 (1919) ...................................................................... 27, 28

*United States v. Arthrex, Inc.,*
  594 U.S. 1 (2021) .......................................................................... 42, 43

*Island Creek Coal Co. v. Bryan*,
  937 F.3d 738 (6th Cir. 2019) ................................... 35

*Jackson v. Coast Paint & Lacquer Co.*,
  499 F.2d 809 (9th Cir. 1974) ................................... 6

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) ..................... 11, 36, 37, 45-46

*Jarkesy v. SEC*,
  51 F.4th 644 (5th Cir. 2022) ........................... 37, 49

*Jersey Central Power & Light Co. v. Township of Lacey*,
  772 F.2d 1103 (3d Cir. 1985) ....................... 5, 23, 24

*K&R Contractors, LLC v. Keene*,
  86 F.4th 135 (4th Cir. 2023) ......................... 40, 49

*Kaufmann v. Kijakazi*,
  32 F.4th 843 (9th Cir. 2022) ............................... 49

*Leachco, Inc. v. Consumer Product Safety Commission*,
  103 F.4th 748 (10th Cir. 2024) ................... 40, 45, 49

*Malouf v. SEC*,
  933 F.3d 1248 (10th Cir. 2019) ......................... 35

*Morrison v. Olson*,
  487 U.S. 654 (1988) ...................... 16, 41, 42, 43, 46

*Nash v. Califano*,
  613 F.2d 10 (2d Cir. 1980) ............................... 44

*National Power Corp. v. FAA*,
  864 F.3d 529 (7th Cir. 2017) ........................... 54

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
  458 U.S. 50 (1982) ....................................... 20

*Atlas Roofing Co. v. Occupational Safety & Health Review Commission*,
  430 U.S. 442 (1977) ....................................... 29

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  584 U.S. 325 (2018) ....................................... 20

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) ................................................................ 36

*Ramspeck v. Federal Trial Examiners Conference,*
    345 U.S. 128, (1953) ............................................................... 44

*Ross v. Blake,*
    578 U.S. 632 (2016) ................................................... 33-34, 34

*Roth v. Norfalco LLC,*
    651 F.3d 367, 370 (3d Cir. 2011) ............................... 3, 4, 5, 7, 31

*SEC v. Jarkesy,*
    144 S. Ct. 2117 (2024) ........ 15, 19, 20, 21, 22, 23, 26, 27, 29, 30, 31, 32, 37

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ................................................................ 42

*Stanton v. Elliott,*
    25 F.4th 227 (4th Cir. 2022) ................................................ 55

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................ 36

*Tull v. United States,*
    481 U.S. 412 (1987) .......................................................... 31, 32

*U.S. Department of Labor v. Old Ben Coal Co.,*
    676 F.2d 259 (7th Cir. 1982) ............................................ 13, 52

*United States v. Batchelder,*
    442 U.S. 114 (1979) ................................................................ 36

*United States v. Core Laboratories, Inc.,*
    759 F.2d 480 (5th Cir. 1985) ................................................ 52

*United States v. International Minerals & Chemical Corp.,*
    402 U.S. 558 (1971) ................................................................ 55

*United States v. L.A. Tucker Truck Lines, Inc.,*
    344 U.S. 33 (1952) ................................................................ 35

*United States v. Linares,*
    921 F.2d 841 (9th Cir. 1990) ................................................ 37

*United States v. Meyer,*
   808 F.2d 912 (1st Cir. 1987) .................................................. 52

*United States v. Perkins,*
   116 U.S. 483 (1886) ............................................. 16, 41, 46-47

*Zhi Fei Liao v. Attorney General,*
   910 F.3d 714 (3d Cir. 2018) .................................................. 34

## Constitution and Statutes:

U.S. Const. amend. VII ............................................................ 19

U.S. Const. art. II, § 2, cl. 2 ........................................... 12, 16, 38

Act of Feb. 24, 1855, ch. 122,
   10 Stat. 612 ............................................................................ 44

Act of June 17, 1930, ch. 497,
   46 Stat. 590 ............................................................................ 44

Hazardous Materials Transportation Act,
   Pub. L. No. 93-633, 88 Stat. 2156 (1975) ....................3, 6, 7, 15, 22, 26, 31

5 U.S.C. § 507 ......................................................................... 18

5 U.S.C. § 557(b) .................................................................... 44

5 U.S.C. § 706 ......................................................................... 18

5 U.S.C. § 1202(d) .................................................................. 46

5 U.S.C. § 3105 ....................................................................... 38

5 U.S.C. § 7521 ........................................................ 12, 16, 46, 47

5 U.S.C. § 7521(a) ....................................................... 40, 44, 46

28 U.S.C. § 2462 ........................................................ 13, 17, 49, 50

49 U.S.C., subtitle III, chapter 51 ....................................... 32-33

49 U.S.C. § 106(b) ................................................................... 7

49 U.S.C. § 323 ................................................................ 38

49 U.S.C. §§ 5101-5128 ..................................................... 29

49 U.S.C. § 5103(a) .................................................... 4, 5, 24

49 U.S.C. § 5103(b)(1) ..................................................... 4, 24

49 U.S.C. § 5103(b)(1)(A) .............................................. 4, 25

49 U.S.C. § 5103(c)(1)(C) ..................................................... 25

49 U.S.C. § 5103a(a)(1)(A) ..................................................... 25

49 U.S.C. § 5104(a)(1) ................................................... 5, 25

49 U.S.C. § 5106 .............................................................. 25

49 U.S.C. § 5117(a)-(b) ...................................................... 26

49 U.S.C. § 5120 .............................................................. 26

49 U.S.C. § 5122 .............................................................. 34

49 U.S.C. § 5122(a) ..................................................... 7, 37

49 U.S.C. § 5123 ...................................... 6, 11, 27, 33

49 U.S.C. § 5123(a)(1)(A)-(B) ....................................... 53-54

49 U.S.C. § 5123(b) .......................................................... 50

49 U.S.C. § 5123(c) ............................................................ 6

49 U.S.C. § 5123(d) ..................................................... 6, 51

49 U.S.C. § 5127(a) ..................................................... 2, 6

49 U.S.C. § 5127(d) .............................................. 16, 33, 34

49 U.S.C. § 46301(d) .......................................................... 32

49 U.S.C. §§ 5103, 5104 ..................................................... 28

50 U.S.C. § 2410(c), (f) (1988) ............................................ 52

## Rules and Regulations:

41 Fed. Reg. 15972, 16030 (Apr. 15, 1976) .................................................. 7

14 C.F.R. § 13.233(a) ............................................................................... 44

14 C.F.R. § 13.233(i) ........................................................................... 16, 33

49 C.F.R. § 1.83(d)(1) ............................................................................ 7, 44

49 C.F.R. §§ 171.1-180.605 ....................................................................... 29

49 C.F.R. § 171.2(e) ........................................................ 10, 13, 29, 53, 57, 59

49 C.F.R. part 172 (2023) ........................................................................... 8

49 C.F.R. § 172.101 .................................................................................. 30

49 C.F.R. § 172.101(c) ................................................................................ 8

49 C.F.R. § 172.101(d) ............................................................................... 8

49 C.F.R. § 172.101(e) ............................................................................... 8

49 C.F.R. § 172.101(f) ............................................................................. 8, 9

49 C.F.R. § 172.101(g) ............................................................................... 8

49 C.F.R. § 172.101(h) ............................................................................... 8

49 C.F.R. § 172.101(i) ................................................................................ 8

49 C.F.R. § 172.101(j) ................................................................................ 8

49 C.F.R. § 172.101(k) ............................................................................... 8

49 C.F.R. § 172.323(a)-(c) ......................................................................... 30

49 C.F.R. § 173.2 ...................................................................................... 8

49 C.F.R. § 173.2, table 1 ........................................................................ 5, 9

49 C.F.R. § 173.24(b) ................................................................................. 9

49 C.F.R. § 173.24(b)(1) ........................................................................ 10, 53

49 C.F.R. § 173.27(c)(2) ........................................................ 29, 30

49 C.F.R. § 173.27(d) ........................................................ 58

49 C.F.R. § 173.27(d)(2) ........................................................ 58, 59

49 C.F.R. § 173.173(b) ........................................................ 10, 11

49 C.F.R. § 173.202 ........................................................ 9, 10, 11

**Other:**

G.S. Aswinprasath et al., 10 *Hazard and Risk Analysis in Spray Painting and Powder Coating of An Automobile Industries*, Advances in Natural and Applied Sciences 192 (2016) ........................................................ 5

Federal Aviation Administration, *PackSafe - Paints and Solvents*, https://perma.cc/V6TK-XNBS ........................................................ 6

*HHS v. Jarboe*, 2023 M.S.P.B. 22 (2023) ........................................................ 47

H.R. Rep. No. 93-1083 (1974) ........................................................ 24

S. Rep. No. 93-1192 (1974) ........................................................ 3, 24

*SSA v. Levinson*, 2023 M.S.P.B. 20 (2023) ........................................................ 47

*Transportation of Hazardous Materials by Air: Hearings Before a Subcomm. on Government Activities of the H. Comm. on Government Operations*, 93d Cong. 1 (1973) ........................................................ 29

## INTRODUCTION

The Hazardous Materials Transportation Act established a framework for regulating the safe transport of radioactive, explosive, corrosive, infectious, combustible, and other hazardous material as it travels in interstate and foreign commerce. The Department of Transportation concluded after a hearing that petitioner Axalta Coating Systems violated the Act by failing to properly package and secure hazardous material that it shipped on a plane. The Department imposed a total penalty of $1,900.

Axalta does not contest that it prepared and shipped a package that leaked hazardous materials into an airplane. Instead, Axalta raises a grab bag of constitutional, statutory, and regulatory challenges to the Department's ability to enforce the Act through administrative proceedings as Congress directed. Each of Axalta's claims is meritless and the agency's decision is well explained and supported by substantial evidence. The petition should be denied.

## STATEMENT OF JURISDICTION

The Federal Aviation Administration (FAA) issued its final decision on June 7, 2023. JA105.[1] Axalta filed a petition for review on August 1, 2023, Dkt. 1, and this Court has jurisdiction under 49 U.S.C. § 5127(a).

## STATEMENT OF THE ISSUES

**1.** Whether the Seventh Amendment precludes Congress from protecting the channels of interstate commerce through administratively determined civil monetary penalties.

**2.** Whether the Hazardous Materials Transportation Act unconstitutionally vests the Department of Transportation with Judicial or Legislative powers.

**3.** Whether an otherwise concededly valid order appointing an administrative adjudicator order is ineffective if not accompanied by some unspecified degree of public ceremony.

**4.** Whether Axalta is entitled to reversal of the agency decision based on the alleged invalidity of a statute restricting the President's ability to remove administrative law judges, even though Axalta has alleged no harm resulting from the fact that its ALJ was not removable at will.

---

[1] "JA" citations refer to the joint appendix, "Supp. App'x" citations refer to the supplemental appendix, and "Add." citations refer to this brief's addendum.

**5.** Whether the statute of limitations to collect a civil penalty ran while the agency was conducting enforcement proceedings to collect a civil penalty.

**6.** Whether the agency decision is based on substantial evidence and is not arbitrary and capricious or otherwise contrary to law.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Background

**A.** Half a century ago, Congress enacted the Hazardous Materials Transportation Act "to protect the Nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." Pub. L. No. 93-633, § 102, 88 Stat. 2156, 2156 (1975). At the time, "those who transported hazardous materials through interstate commerce were forced to navigate a patchwork of sometimes conflicting state regulations," and the resulting "fragmented" regulatory regime needed a "coherent approach." *Roth v. Norfalco LLC*, 651 F.3d 367, 370 (3d Cir. 2011) (quoting S. Rep. No. 93-1192, at 8 (1974)). The lack of a uniform approach was a matter of national concern, as there were "more than 2 billion tons of [hazardous] substances" transported annually, with "as many as 250,000 shipments a day." S. Rep. No. 93-1192, at 7. At the same time, there were thousands of incidents every year involving the

"unintentional release[] of hazardous substances in the course of transportation," causing multiple deaths and hundreds of injuries. *Id.* The Act addressed these concerns by drawing "the Federal Government's now-fragmented regulatory and enforcement power over the movement of hazardous materials in commerce into one consolidated and coordinated effort under the direction of the Secretary of Transportation." *Roth*, 651 F.3d at 370.

Congress accordingly directed the Secretary to "prescribe regulations for the safe transportation" of hazardous materials "in intrastate, interstate, and foreign commerce." 49 U.S.C. § 5103(b)(1). And Congress empowered the Secretary to designate materials as hazardous "when the Secretary determines that transporting the material" in particular quantities and ways "may pose an unreasonable risk to health and safety or property." *Id.* § 5103(a). People who transport hazardous materials must comply with these regulatory requirements, as must people who prepare hazardous materials for transportation, those who cause hazardous materials to be transported, and those who certify "compliance with any requirement under this chapter." *Id.* § 5103(b)(1)(A). And people who represent "by marking or otherwise" that a package "for transporting hazardous material is safe, certified, or complies with this chapter" may only do so if the

package "meets the requirements of each applicable regulation." *Id.* § 5104(a)(1).

Congress expected that hazardous materials may include explosives, infectious substances, toxic substances, compressed gasses, and other materials. 49 U.S.C. § 5103(a). Thus, the Secretary of Transportation regulates the transportation of radioactive materials, *see Jersey Central Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1112-13 (3d Cir. 1985), and railway cars carrying tanks of sulfuric acid, *Roth*, 651 F.3d at 371.

As relevant here, Congress also directed the Secretary to regulate the transportation of "flammable or combustible liquid[s]," 49 U.S.C. § 5103(a). That includes the shipment of paint, which is a "flammable and combustible liquid." 49 C.F.R. § 173.2, table 1 (capitalization omitted); Add. 25. Paints and solvents "can present fire or explosion hazards" because their vapors and mixed paint deposits "may be liable to spontaneous combustion" when exposed to heat, sparks, or static electricity. G.S. Aswinprasath et al., 10 *Hazard and Risk Analysis in Spray Painting and Powder Coating of An Automobile Industries*, Advances in Natural and Applied Sciences 192 (2016). When paint fumes combust, they can cause injury to people and damage to property, leaving victims

"severely burned." *Jackson v. Coast Paint & Lacquer Co.*, 499 F.2d 809, 810 (9th Cir. 1974) (tort action against paint manufacturer). Thus, to prevent sudden fires or explosions on aircraft, "[m]ost paints and paint-related solvents" are "forbidden in carry-on or checked baggage." Federal Aviation Administration, *PackSafe - Paints and Solvents*, https://perma.cc/V6TK-XNBS.

**B.** To enforce the Act and its implementing regulations, Congress directed the Secretary to determine "after notice and an opportunity for a hearing," whether a person has "knowingly committed an act which is a violation" of the Act or its regulations. Pub. L. No. 93-633, § 110(a)(1), 88 Stat. at 2160 (codified as amended at 49 U.S.C. § 5123). If the Secretary determines that such a violation occurred, then the Secretary may impose a civil penalty after considering the "nature, circumstances, extent, and gravity of the violation," along with the person's culpability, past history, and ability to pay. 49 U.S.C. § 5123(c). If the person refuses to pay the civil penalty, Congress further authorized the United States to bring suit for its collection. *Id.* § 5123(d). In such a collection action, however, "the amount and appropriateness of the civil penalty shall not be subject to review." *Id.* Instead, the person may obtain judicial review of a civil penalty by seeking review in the courts of appeals. *Id.* § 5127(a).

Separately, Congress also provided that the Attorney General—at the Secretary's request—may sue in district court to enforce the Act and its regulations. 49 U.S.C. § 5122(a). In that suit, the court "may award appropriate relief," including injunctive relief, punitive damages, and an "assessment of civil penalties considering the same penalty amounts and factors as prescribed for the Secretary in an administrative case under section 5123." *Id.*[2]

For violations of the Act and its regulations involving air transportation, the Secretary has delegated the duty of enforcement and administrative proceedings to the FAA Administrator, 49 C.F.R. § 1.83(d)(1), and the Administrator reports to the Secretary, 49 U.S.C. § 106(b).

**C.** Like all other hazardous materials, shipments of paint are subject to "comprehensive" regulations under the Act. *Roth*, 651 F.3d at 371; *see also* 41 Fed. Reg. 15972, 16030 (Apr. 15, 1976) (designating paint as a combustible and flammable liquid). The Department of Transportation

---

[2] The Hazardous Materials Transportation Act originally did not authorize the imposition of civil penalties in district court actions—those were only available in an administrative hearing before the Secretary. Pub. L. No. 93-633, §§ 110-111, 88 Stat. at 2160-61. In 2005, Congress amended the statute to also permit the assessment of civil penalties in district court actions initiated by the Attorney General. Pub. L. No. 109-59, title VII, subtitle A, § 7119, 119 Stat. 1144, 1905 (2005).

has consolidated many of these regulations for reference by way of an exhaustive table that lists all designated hazardous materials and identifies the relevant requirements for transporting any specific hazardous material in commerce.  49 C.F.R. part 172 (2023) (pages 161-319).  The regulations provide the proper shipping name that must be labeled on the container, *id.* § 172.101(c), as well as an accompanying identification number, *id.* § 172.101(e).

Hazardous materials are designated to different hazard classes, 49 C.F.R. § 172.101(d), indicating whether they are explosives, poisonous gasses, combustible liquids, or materials that are infectious, radioactive, or corrosive, *id.* § 173.2.  Based on the "degree of danger presented by the material," it must be appropriately packaged according to "the applicable packing authorizations," *id.* § 172.101(f), and must bear the appropriate "hazard warning labels," *id.* § 172.101(g).  The table for hazardous materials further identifies if there are any special provisions that apply to the material, *id.* § 172.101(h), the general packaging requirements for bulk and non-bulk shipments (along with relevant exceptions), *id.* § 172.101(i), the maximum quantities of the material that may be shipped by air or passenger train, *id.* § 172.101(j), and how the hazardous material must be stowed once on board, *id.* § 172.101(k).

As relevant here, shipments of paint that pose a "medium" risk of danger are in Packing Group II. 49 C.F.R. § 172.101(f). Non-bulk shipments of paint may be placed in an authorized inner packaging (like a metal canister) and an authorized outer packaging (like a fiberboard box). *Id.* § 173.202. This package must be designed, constructed, and closed to ensure "that under conditions normally incident to transportation * * * there will be no identifiable (without the use of instruments) release of hazardous materials to the environment." *Id.* § 173.24(b).

## II. Factual Background and Prior Proceedings

**A.** In 2017, petitioner Axalta Coating Systems shipped a package containing four liters of paint through Federal Express. JA19. Axalta completed a "shipper's declaration for dangerous goods," indicating that the package would be shipped by Federal Express's aircraft. Supp. App'x 6. Axalta's declaration further indicated that the shipment contained paint, which was hazard class 3 for flammable and combustible liquids, 49 C.F.R. § 173.2, and was required to comply with the regulations for Packing Group II because it posed a medium degree of danger, *id.* § 172.101(f). Supp. App'x 6.

After the package had been transported by aircraft, a Federal Express employee discovered that Axalta's package had leaked paint. JA131. The

paint had escaped its metal container, leaked out of the plastic bag surrounding that container, and seeped through the cardboard box that acted as the package's exterior.  Supp. App'x 1, 3, 7-18 (photographs).

In 2018, FAA notified Axalta that it had likely violated the applicable regulations and that the agency would be seeking a civil penalty.  In 2021, FAA issued a final notice of proposed civil penalties, alleging that Axalta had violated three regulations:

- 49 C.F.R. § 171.2(e), which prohibits offering hazardous materials for transportation unless the material is properly packaged;

- 49 C.F.R. § 173.24(b)(1), which requires such packages to be designed, constructed, maintained, and closed so that they do not release the hazardous materials under normal conditions; and

- 49 C.F.R. § 173.173(b), which requires shipments of paint to comply with the packaging regulations in 49 C.F.R. § 173.202.

JA185-86.

**B.**	Axalta then requested an administrative hearing before an administrative law judge (ALJ).  JA129.  After the hearing, the ALJ determined that Axalta had violated 49 C.F.R. §§ 171.2(e) and 173.24(b)(1) because the package had not been properly secured and hazardous material had leaked out of its container.  JA133.  But the ALJ determined that Axalta

had complied with the packaging requirements of 49 C.F.R. § 173.202, because it had shipped the paint in a metal cannister surrounded by a cardboard box as permitted by that regulation.  JA133.  Accordingly, the ALJ held that Axalta had not violated 49 C.F.R. § 173.173(b).  JA133-34.

For the two violations, FAA enforcement staff sought a total civil penalty of $11,000.  JA134.[3]  The ALJ found that amount unwarranted and determined that—consistent with FAA's internal guidance documents—"a penalty of $950 per violation [was] appropriate," for a total penalty of $1,900 (eighty-two percent less than what the enforcement staff had sought).  JA137.

**C.**    Both sides filed an administrative appeal with the FAA's Acting Administrator, with Axalta contesting the merits and FAA's enforcement staff seeking a greater civil penalty.  The Administrator determined that both sides' arguments lacked merit and ultimately affirmed the ALJ's decision.  JA128.

The Administrator rejected Axalta's argument that it was entitled to a jury trial under the Seventh Amendment.  JA108-09.  Axalta relied on the Fifth Circuit's decision in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022),

---

[3] The statutory maximum for civil penalties is $75,000 per violation. 49 U.S.C. § 5123.

which concerned "securities fraud charges [that] were akin to old common law fraud actions." JA109. By contrast, Axalta had "not proffer[ed]—much less establish[ed]—an analogous" common law cause of action for "the statutory scheme found in" the Hazardous Materials Transportation Act and its implementing regulations. JA109.

The Administrator likewise rejected Axalta's argument that the ALJ had not been validly appointed as an officer under the Appointments Clause of the Constitution. JA109-10. Axalta did not contest that the ALJ had been appointed by the Secretary of Transportation, who serves as the Head of a Department and who may appoint inferior officers. U.S. Const. art. II, § 2, cl. 2. Axalta instead argued that a constitutional appointment requires "public notice or a ceremony," but cited no constitutional text or precedential authority that imposed such a requirement. JA109-10. Because the ALJ was appointed in 2019, and the administrative proceeding began in 2021, the Administrator determined that the ALJ had been properly and timely appointed. JA110.

Axalta also challenged the ALJ's removal restrictions, arguing that the Secretary's ability to remove the ALJ for "good cause," 5 U.S.C. § 7521, violated the separation of powers. JA7. The Administrator declined to rule on that challenge since those statutory restrictions are generally applicable

to all ALJs across the federal government and did not present a challenge to "a DOT or FAA regulation or policy," but noted that the challenge had been preserved for review.  JA108.

Beyond these constitutional challenges, Axalta further argued that the FAA was prohibited from seeking civil penalties because more than five years had by then passed since Axalta's violation.  JA12.  The Administrator explained that Axalta's argument mistakenly relied on 28 U.S.C. § 2462, a statute that allows the United States five years to collect civil penalties "after the administrative proceeding has ended, a penalty has been assessed, and the violator has failed to pay the penalty."  JA119 (quoting *U.S. Department of Labor v. Old Ben Coal Co.*, 676 F.2d 259, 261 (7th Cir. 1982)).

The Administrator likewise held that the administrative complaint was adequately pleaded because it alleged that Axalta knowingly offered a package of paint for shipment when the package did not comply with the applicable regulations.  JA118.  The Administrator also rejected Axalta's argument that the ALJ improperly considered other regulations in determining whether Axalta violated 49 C.F.R. § 171.2(e).  The Administrator explained that § 171.2(e) "is a general regulation that expressly prohibits the transportation of hazardous material not packaged

adequately in accordance with" the Hazardous Materials Regulations. JA124.

The Administrator also rejected the cross-appeal by FAA's enforcement staff.  JA124.  The Administrator explained that the ALJ had consulted the correct version of FAA's guidance regarding civil penalties, JA125, that enforcement had failed to demonstrate that Axalta regularly offered hazardous material for transportation, JA125, and that the ALJ's civil penalty assessment was "a proper exercise of discretion," JA127.

**D.**  Axalta then petitioned this Court for review.  Before filing its brief on the merits, Axalta asked the Court to summarily vacate the agency's decision, arguing that the FAA's Acting Administrator served in violation of the Federal Vacancies Reform Act.  Dkt. 12.  FAA responded, providing documentation that the Acting Administrator's service complied with the statutory requirements and arguing that Axalta's argument had not been properly preserved for judicial review because it had never been presented to the agency.  Dkt. 14.  The Court denied Axalta's motion, Dkt. 16, and Axalta does not raise the argument in its opening brief.

## SUMMARY OF ARGUMENT

**I.**  Congress constitutionally authorized the Secretary of Transportation to promulgate extensive and comprehensive regulations

governing the transportation of hazardous materials in interstate and foreign commerce, to adjudicate violations of those regulations, and to impose civil penalties when appropriate. This statutory and regulatory regime was "unknown to the common law," and Axalta makes no claim that it was "derive[d] from" or "interpreted in light of," the common law. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2138 (2024). Instead, consistent with Congress's declaration that the Act was necessary "to protect the Nation," Pub. L. No. 93-633, § 102, 88 Stat. 2156, 2156 (1975), Congress created "'a new cause of action, and remedies therefor, unknown to the common law,' because traditional rights and remedies were inadequate to cope with a manifest public problem," *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60 (1989). The Act creates public rights, which may constitutionally be assigned to and adjudicated by the Executive Branch, including the imposition of civil penalties. *Jarkesy*, 144 S. Ct. at 2132-33. And because that assignment of adjudicative responsibilities is constitutional, "the Seventh Amendment poses no independent bar." *Granfinanciera*, 492 U.S. at 53-54.

**II**. Consistent with that conclusion, Congress did not violate Article III or the nondelegation doctrine by directing the Secretary to adjudicate violations of the Hazardous Materials Transportation Act. Adjudication of public rights "do not require judicial determination." *Ex parte Bakelite*

*Corp.,* 279 U.S. 438, 451 (1929).  And the Executive Branch's choice of whether and how to enforce the law is a quintessential use of the executive power that does not implicate the nondelegation doctrine, which is solely concerned with the delegation of legislative authority.  In all events, Axalta has not properly presented these arguments because it failed to raise them before the agency, as required by statute and regulation.  49 U.S.C. § 5127(d); 14 C.F.R. § 13.233(i).

**III.**    The Secretary of Transportation appointed the ALJ who heard this case years before the proceedings began.  JA62.  Accordingly, the ALJ received a constitutional appointment by the Head of a Department under the Appointments Clause.  U.S. Const. art. II, § 2, cl. 2.  Axalta asserts that this appointment is ineffective unless accompanied by a public ceremony, but cites no constitutional text or precedent for that proposition.

**IV.**    Congress established that ALJs may be removed by a Department Head for "good cause."  5 U.S.C. § 7521.  Four courts of appeals have correctly refused to invalidate agency action based on the asserted unconstitutionality of that provision.  That removal restriction is consistent with more than a century of Supreme Court precedent, which has consistently upheld removal restrictions for inferior officers.  *United States v. Perkins*, 116 U.S. 483 (1886); *Morrison v. Olson*, 487 U.S. 654 (1988).

Here, the Secretary may remove an ALJ for good cause, and the President may remove the Secretary at will.  There is thus no constitutional impediment to the President's oversight of the Executive Branch.

Moreover, Axalta has not alleged and fails to demonstrate that the challenged removal statute caused it "compensable harm."  *Collins v. Yellen*, 594 U.S. 220, 259 (2021).  As this Court recently explained, "actions taken by an improperly insulated" officer "are not 'void' and do not need to be" reversed "unless a plaintiff can show that the removal provision harmed him."  *CFPB v. National Collegiate Master Student Loan Trust*, 96 F.4th 599, 607 (3d Cir. 2024).  Because Axalta failed to make that showing, it is not entitled to reversal.

**V.**    This proceeding is also not time barred.  There is no dispute that the agency initiated the underlying enforcement action here within the 5-year limitations period that Axalta acknowledges to be applicable.  *See* 28 U.S.C. § 2462.  Axalta's claim that the limitations period continued to run during the administrative proceeding, and that the agency was required to dismiss its proceeding midstream after five years had elapsed, is without merit.

**VI.**    The agency's decision is reasonable and supported by substantial evidence, as required under the Administrative Procedure Act,

5 U.S.C. § 507.  Contrary to Axalta's assertions, the administrative complaint sufficiently alleged that Axalta knowingly violated the Act's regulations—Axalta prepared the package, knew it contained paint, offered it for air shipment, and its package controls failed causing the paint to leak out of multiple enclosures.  Axalta likewise errs in claiming that the ALJ violated due process by inventing a new charge and holding Axalta liable for it.  Axalta was afforded notice and an opportunity to respond to the violations.

## STANDARD OF REVIEW

The Court reviews agency action to determine if it is "arbitrary, capricious," or "otherwise not in accordance with law," and whether it is supported by substantial evidence.  5 U.S.C. § 706.  The Court reviews legal issues de novo.  *Dinnall v. Gonzales*, 421 F.3d 247, 251 (3d Cir. 2005).

## ARGUMENT

### I.   Congress Constitutionally Regulated the Transportation of Hazardous Materials and Authorized the Secretary to Adjudicate Violations and Impose Civil Penalties

Axalta asserts that FAA's civil penalty order is unconstitutional because a civil penalty for violating the Hazardous Materials Transportation Act could only be awarded by a jury.  Br. 10-16.  But Axalta's argument misunderstands the framework of the Seventh Amendment, which allows for Executive adjudication in these circumstances.

## A. Seventh Amendment Framework

The Seventh Amendment provides that "the right of trial by jury shall be preserved" for "Suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. The Seventh Amendment thus "preserve[s] the right to jury trial as it existed in 1791" and applies to "statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts" at the Founding (as opposed to claims in equity and admiralty). *Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 41-42 (1989).

In determining whether a federal statute implicates the Seventh Amendment, the Court looks to whether "the claim is 'legal in nature.'" *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024) (quoting *Granfinanciera*, 492 U.S. at 53). A claim for punitive "money damages" without equitable considerations are a "prototypical common law remedy." *Id.* at 2129. Accordingly, we do not contest that FAA's civil penalty order "implicates the Seventh Amendment." *Id.* at 2127.

That, however, is still the beginning of the analysis, not the end. The Court next asks "whether Congress may assign" adjudication of the claim "to a non-Article III adjudicative body that does not use a jury as factfinder." *Granfinanciera*, 492 U.S. at 42; *accord Jarkesy*, 144 S. Ct. at

2127 (employing "the approach set forth in *Granfinanciera*"). That option is available to Congress when an adjudication involves "'public rights,' *e.g.*, where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights." *Granfinanciera*, 492 U.S. at 51. Violations of public rights may be adjudicated by the Executive Branch "free from the strictures of the Seventh Amendment." *Id.*

The Supreme Court has never definitively identified the distinguishing features of public rights. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018). But it is well established that the Executive Branch may adjudicate matters related to "the congressional power as to interstate and foreign commerce, taxation, immigration, the public lands, public health, the facilities of the post office, pensions, and payments to veterans." *Crowell v. Benson*, 285 U.S. 22, 51 (1932); *accord Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 n.22 (1982) (quoting *Crowell*'s "attempt[] to catalog some of the matters that fall within the public-rights doctrine"). *See also Jarkesy*, 144 S. Ct. at 2133 (identifying "categories of adjudications [that] fall within the exception, [as] including relations with Indian tribes, the administration of public lands, and the granting of public benefits such as payments to veterans, pensions, and patent rights" (citations omitted)).

The Supreme Court has not categorically limited public rights to these specifically identified areas, but it has clarified that that doctrine does not extend to "[w]holly private tort, contract, and property cases, as well as a vast range of other cases." *Granfinanciera*, 492 U.S. at 51.

Recently in *Jarkesy*, the Supreme Court considered whether the Securities and Exchange Commission could use an administrative proceeding to impose civil penalties when a person had violated the federal securities laws' "antifraud provisions [that] replicate common law fraud." *Jarkesy*, 144 S. Ct. at 2127. The Supreme Court explained that although the relevant federal securities law provisions were part of a "newly fashioned regulatory scheme," the alleged fraud violations were "a common law suit in all but name," and so did not involve public rights. *Id.* at 2136. Instead, the government's enforcement action "target[ed] the same basic conduct as common law fraud," under a statute that "employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles" to the common law. *Id.*

In so holding, *Jarkesy* did not overrule any Supreme Court precedent, recognizing that the Seventh Amendment does not preclude Executive adjudication of public rights, including proceedings to impose civil monetary penalties.

**B.    Axalta's Violations of the Hazardous Materials Transportation Act Do Not Derive From the Common Law and Instead Concern Public Rights**

**1.**  Axalta argues that *Jarkesy* resolves this case.  But contrary to Axalta's assertion (Br. 12), *Jarkesy* did not categorically hold that Congress may never authorize the administrative imposition of civil monetary penalties.  If that were true, the Court would have had no need to embark on a lengthy discussion of the public rights doctrine.  *See Jarkesy*, 144 S. Ct. at 2131-39.  And Axalta elides the meaningful substantive differences between the Hazardous Materials Transportation Act and the securities fraud action at issue in *Jarkesy*.

The Hazardous Materials Transportation Act vindicates uniquely sovereign interests of the United States.  It protects the integrity of the channels of interstate and foreign commerce against the disruptions that could result from the mishandling of hazardous material.  And it shields the public at large from the catastrophic and dispersed fallout that can result from the unsafe transportation of such material.  The Act serves "to protect the Nation adequately against the risks of life and property which are inherent in the transportation of hazardous materials in commerce."  Pub. L. No. 93-633, § 102, 88 Stat. 2156, 2156 (1975).  In both purpose and design, the Act differs markedly from the "SEC's antifraud provisions,"

where Congress acted merely to "regulat[e] transactions between private individuals interacting in a pre-existing market." *Jarkesy*, 144 S. Ct. at 2127, 2136. Axalta's liability is not traceable to a breach of a contractual duty that it owed to Federal Express, but to its improper handling of combustible and flammable material that jeopardizes the safety of the broader public.

The Act implemented novel and pervasive regulation of the transportation of hazardous materials commensurate with Congress's objectives in protecting the public against the unsafe transportation of hazardous materials. These regulations carried "no common law soil." *Jarkesy*, 144 S. Ct. at 2137. Rather, the Act was a reaction to the inadequacies of common law remedies that failed to safeguard the public.

Congress passed the Act "to replace a patchwork of sometimes conflicting state regulations" with "a general pattern of uniform, national regulations" governing the transport and packaging of hazardous materials. *Jersey Central Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1112 (3d Cir. 1985). Thus, rather than mirroring existing common law claims for fraud, torts, or property damage, Congress sought to provide uniform federal regulation to address the "more than 2 billion tons of" hazardous materials that were being shipped every year, "in as many as

250,000 shipments a day." S. Rep. No. 93-1192, at 7 (1974). Yet many of those shipments did not comply with existing regulations—90% of inspected air shipments "were in violation of the regulations," and "240 discrepancies (i.e., violations) were found in 70 shipments examined carefully over a 60-day period." *Id.* at 8. From January 1973 to June 1974, shipments of hazardous materials were involved in 124 rail accidents, killing or wounding 166 people, and causing contamination by "potentially lethal chemicals" in 29 cases. H.R. Rep. No. 93-1083, at 15 (1974). Five of those accidents caused the evacuation of a combined 11,400 people, and additional evacuations were necessary in another 25 cases. *Id.* Eight of the accidents "involved bombs, ammunition or other explosives," while most of the other accidents involved "chemicals such as chlorine, LP gas, hydrochloric acid, ammonia, sulfuric acid and crude cyanide." *Id.*

Congress responded to this systemic and nationwide concern by directing the Secretary to "designate material" as hazardous when "transporting the material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property." 49 U.S.C. § 5103(a). And for such hazardous materials, the Secretary must "prescribe regulations for the safe transportation * * * in intrastate, interstate, and foreign commerce," *id.* § 5103(b)(1), and may further prescribe regulations

for the material's proper handling, *id.* § 5106. People involved in the transportation of hazardous materials must comply with those regulations, *id.* § 5103(b)(1)(A), and may mark a package as safe for transport only if the entire package "meets the requirements of each applicable regulation prescribed under this chapter," *id.* § 5104(a)(1).

These regulations do not operate in a vacuum, but are instead part of a larger effort to coordinate and facilitate the movement of hazardous materials generally, while responding to the unique needs of the United States.

- In the event of a federally declared disaster and emergency, the Secretary may waive the Hazardous Materials Regulations when "necessary to facilitate the safe movement of hazardous materials into, from, and within" the disaster area. 49 U.S.C. § 5103(c)(1)(C).

- Motor vehicle operators who transport hazardous material in commerce may not receive a license unless the Secretary of Homeland Security first determines that the operator "does not pose a security risk." 49 U.S.C. § 5103a(a)(1)(A).

- The Secretary may issue special permits authorizing variances from the Act and its regulations, so long as the variance "achieves a safety level at least equal to the safety level required under this chapter," and supported

by "a safety analysis prescribed by the Secretary that justifies the special permit." 49 U.S.C. § 5117(a)-(b).

- The Secretary participates in "international forums that establish or recommend mandatory standards and requirements" for transporting hazardous material, and ensures that the federal regulations "to the extent practicable," are "consistent with" those international standards. 49 U.S.C. § 5120.

This statutory and regulatory regime was "unknown to the common law," *Jarkesy*, 144 S. Ct. at 2138, and Axalta makes no claim that "the pertinent statutory provisions derive from" or "are interpreted in light of, their common law counterparts," *id.* Instead, consistent with Congress's declaration that the Act was necessary "to protect the Nation" 88 Stat. at 2156, Congress created "'a new cause of action, and remedies therefor, unknown to the common law,' because traditional rights and remedies were inadequate to cope with a manifest public problem." *Granfinanciera*, 492 U.S. at 60.

**2.** Accordingly, the Act deals with public rights "in connection with the exercise of the congressional power" to regulate "interstate and foreign commerce." *Crowell*, 285 U.S. at 51. Congress may choose to assign adjudication of violations of the Act to the federal judiciary, but "the mode

of determining matters of this class is completely within congressional control. Congress may reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals." *Id.* at 50 (quoting *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929)). Here, the Act permissibly authorizes the Secretary to adjudicate violations of the Act and impose civil penalties when appropriate. 49 U.S.C. § 5123. *Accord Jarkesy*, 144 S. Ct. at 2132-33 (explaining that executive imposition of civil penalties is constitutional in matters involving public rights).

Consistent with this conclusion, the Act mirrors the public rights scheme considered by the Supreme Court in *Houston v. St. Louis Independent Packing Co.*, 249 U.S. 479 (1919), which allowed the Secretary of Agriculture to protect public rights to safe food by regulating interstate commerce. Under the Meat Inspection Act of 1906, ch.3913, 34 Stat. 669, Congress directed the Secretary of Agriculture to inspect meat products to ensure that they were "sound, healthful, [and] wholesome," and if so then the product would be labeled "Inspected and passed," and could move in interstate commerce. *Id.* at 674-75. Under that authority, the Secretary promulgated regulations setting certain food quality standards, and meat that failed to meet those standards would be "exclude[d] * * * from interstate commerce." *Houston*, 249 U.S. at 480-81. The Supreme Court

rejected a challenge to those regulations, holding that Congress constitutionally "committed to the head of the department, constantly dealing with such matters, the discretion to determine" whether the food's labeling "would be false or deceptive or not." *Houston*, 249 U.S. at 487. Under those "circumstances as we have here this court will not review" the "decision of the Secretary of Agriculture" so long as it was supported by "substantial evidence." *Id.* at 486-87. The Supreme Court later explained in *Crowell* that this kind of comprehensive regulatory authority over "interstate and foreign commerce" was a "[f]amiliar illustration[]" of public rights that can be determined by the Executive Branch. *Crowell*, 285 U.S. at 51 & n.13.

As in *Houston*, the Secretary of Transportation has been directed to define what constitutes a hazardous material, and to require that such materials be properly labeled and marked to be transported in commerce. 49 U.S.C. §§ 5103, 5104. Indeed, the Hazard Materials Transportation Act goes to the heart of Congress's power to regulate interstate and foreign commerce—it safeguards the very channels of commerce against the massive disruptions caused the unsafe transportation of hazardous

materials. *See supra* pp. 23-24.[4] The resulting comprehensive and reticulated scheme, *see* 49 U.S.C. §§ 5101-5128 (Hazardous Materials Transportation Act); 49 C.F.R. §§ 171.1-180.605 (Hazardous Materials Regulations), was "unknown to the common law," *Jarkesy*, 144 S. Ct. at 2138, and Axalta cites no comparable common-law claims.

Thus, "[r]ather than reiterate common law terms of art," the regulations governing the proper packaging, labeling, and shipment of hazardous materials "instead resemble[] a detailed building code." *Jarkesy*, 144 S. Ct. at 2137 (discussing the Occupational Safety and Health Act and *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977)). For example, hazardous liquid materials that are shipped by aircraft—except for packages marked "UN3082, Environmentally hazardous substance, liquid, n.o.s.,"—must "be capable of withstanding" certain pressure levels "without leakage." 49 C.F.R. § 173.27(c)(2). For "liquids in Packing Group III of Class 3 or

---

[4] At the time Congress passed the Act, it was "estimated that a majority of all commercial airline flights in our Nation also carry some form of hazardous materials in their baggage and cargo compartments," including "small arms ammunition," infectious agents, "poisonous substances," and materials that "cannot be extinguished should a fire occur with extinguishing agents normally carried on passenger aircraft." *Transportation of Hazardous Materials by Air: Hearings Before a Subcomm. on Government Activities of the H. Comm. on Government Operations*, 93d Cong. 1 (1973).

Division 6.1," the container must withstand "[a]n internal pressure which produces a gauge pressure of not less than 75 kPa (11 psig)." *Id.* But if that pressure is lower than "1.75 times the vapor pressure at 50° C (122° F) less 100 kPa (15 psia)," then the package must be able to withstand that higher pressure instead. *Id. See also id.* § 172.323(a)-(c) (setting out detailed requirements for biohazard warnings).

In addition to these and other regulations, the Secretary has set forth a comprehensive table at 49 C.F.R. § 172.101, which lists all designated hazardous materials along with their name, identification number, hazard division or class, packing group, applicable special provisions, general packaging requirements, quantity limitations, and requirements for stowage onboard a vessel. The portion of the table that includes the paint shipped here, 49 C.F.R. § 172.101, is reproduced in the Addendum to this brief at Add. 25.

These comprehensive regulations are not designed "to enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law." *Jarkesy*, 144 S. Ct. at 2137. Rather, Congress granted the Secretary a "broad mandate providing" regulatory authority "for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce." *American Chemistry Council v.*

*Department of Transportation*, 468 F.3d 810, 812 (D.C. Cir. 2006). These regulations would "protect the Nation," 88 Stat. at 2156, and "achieve greater uniformity * * * to promote the public health, welfare, and safety at all levels," *Roth v. Norfalco LLC*, 651 F.3d 367, 371 (3d Cir. 2011).

**3.** Axalta appears to assert that the civil penalty here is a common law action for debt and therefore cannot be considered a public right. Br. 12. If that were correct, there would never be any public-rights analysis—all administrative civil penalties would be analogous to actions for debt and therefore based on the common law. The Supreme Court has never endorsed such a categorical proposition, and its recent opinion in *Jarkesy* spent pages clarifying the public-rights analysis. 144 S. Ct. at 2131-39.

Axalta also bases its claim on *Tull v. United States*, 481 U.S. 412 (1987), but *Tull* considered a much different question—whether civil penalties of the Clean Water Act were equitable or legal relief. *Id.* at 422-25. The parties disputed whether Clean Water Act violations were more like an action for debt (a common law claim) or an action to abate a public nuisance (which sought equitable relief). *Id.* at 419-21. The Supreme Court found it unhelpful to conduct "an 'abstruse historical' search for the nearest 18th-century analog," and instead focused on the nature of the relief sought. *Id.* at 421. Because the civil penalty was not "calculated solely on

the basis of equitable determinations," the Court concluded that the complaint sought to impose punitive civil penalties. *Id.* at 422; *accord Jarkesy*, 144 S. Ct. at 2130 (explaining that the SEC civil penalty was punitive rather than equitable). That analysis is of little relevance here, where the parties agree that the civil penalty here implicates the Seventh Amendment. And because *Tull* was a district court suit, there was no need to analyze whether the public rights doctrine applied because "in an ordinary civil action in the district courts * * * a jury trial must be available if the action involves" legal remedies. *Curtis v. Loether*, 415 U.S. 189, 195 (1974).

**4.** Axalta mistakenly suggests that the Supreme Court in *Jarkesy* explicitly held that FAA's statutory authority for this proceeding is unconstitutional. Br. 13. But Axalta cites the *Jarkesy* dissent, which merely identified "agencies that can impose civil penalties in administrative proceedings." *Jarkesy*, 144 S. Ct. at 2173 (Sotomayor, J., dissenting). The majority did not hold that these statutes are unconstitutional—instead, it required a case-by-case analysis of whether those statutes address public or private rights. *Id.* at 2131 (majority opinion).[5]

---

[5] Moreover, the statute Axalta cites 49 U.S.C. § 46301(d), governs FAA's authority for a variety of enforcement actions, but not for the Hazardous Materials Transportation Act (49 U.S.C., subtitle III, chapter

*Continued on next page.*

## II. Congress Constitutionally Directed Executive Enforcement of the Hazardous Materials Transportation Act

For the first time on appeal, Axalta asserts that Congress unconstitutionally vested the Secretary with Article III judicial power and violated the nondelegation doctrine by permitting the Secretary to adjudicate violations of the Act and its regulations. Br. 16-19. Neither argument has merit, and neither argument is properly before the Court.

To begin, Congress provided that on judicial review from an adjudication of the Hazardous Materials Transportation Act, "the court may consider an objection * * * only if the objection was made in the course of a proceeding or review conducted by the Secretary or if there was a reasonable ground for not making the objection in the proceeding." 49 U.S.C. § 5127(d). FAA regulations also require presenting objections in the administrative proceeding, as the "fail[ure] to object to any alleged error * * * waives any objection to the alleged error." 14 C.F.R. § 13.233(i). This "mandatory language means a court may not excuse a failure to exhaust" because "Congress sets the rules" and courts may not "add unwritten limits onto their rigorous textual requirements." *Ross v. Blake*, 578 U.S. 632, 639

---

51). Instead, the Act provides its own authority for civil penalty enforcement actions, *id.* § 5123, which none of the opinions in *Jarkesy* discussed.

(2016). The only exception to this requirement is "the one baked into its text," *id.* at 648—whether there was a "reasonable ground for not making the objection," 49 U.S.C. § 5127(d).

Here, there is no reason why Axalta could not have raised an Article III or nondelegation claim in the administrative proceeding. Indeed, Axalta raised several different constitutional and statutory arguments to the agency, including other separation-of-powers theories and its Seventh Amendment challenge. JA1-12. Axalta offers no reason why it could not have similarly raised these constitutional challenges as well. If Axalta had done so, the agency would have had "an opportunity to resolve issues raised before it prior to any judicial intervention." *Zhi Fei Liao v. Attorney General*, 910 F.3d 714, 718 (3d Cir. 2018). Indeed, Axalta's theory appears to be that the Secretary was constitutionally compelled to have the Attorney General bring suit in district court under 49 U.S.C. § 5122. If Axalta had raised that argument, the agency could have considered whether to take that path. But "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time

appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).[6]

Should the Court reach the merits, Axalta's claims fail. First, Axalta mistakenly asserts that adjudications of the Hazardous Materials Transportation Act require the judicial power of Article III which the Secretary cannot exercise. Br. 16-18. But the Act concerns public rights, which "do not require judicial determination and yet are susceptible of it." *Ex parte Bakelite Corp.,* 279 U.S. at 451. Congress has complete control of determining how public rights are adjudicated, and may assign that duty to itself, to the Executive, or to Article III courts. *Id.* When the Executive engages in these adjudications, which it has done "since the beginning of the Republic," the adjudications may take a "'judicial' form[], but they are exercises of—indeed, under our constitutional structure they *must be*

---

[6] The courts of appeals have consistently held that constitutional claims are subject to the usual rules of statutory and regulatory exhaustion. *E.g.*, *David Stanley Consultants v. Director, Office of Workers' Compensation Programs*, 800 F. App'x 123, 128 (3d Cir. 2020); *Gonnella v. SEC*, 954 F.3d 536, 544-55 (2d Cir. 2020) (citing *David Stanley*); *Edd Potter Coal Co. v. Director, Office of Workers' Compensation Programs*, 39 F.4th 202, 206-07 (4th Cir. 2022); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 754 (6th Cir. 2019); *Fleming v. U.S. Department of Agriculture*, 987 F.3d 1093, 1098-1101 (D.C. Cir. 2021); *Malouf v. SEC*, 933 F.3d 1248, 1255-58 (10th Cir. 2019).

exercises of—the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013).

Second, Axalta errs in claiming that the Act violates the nondelegation doctrine by permitting enforcement through district court suits or administrative adjudication. Br. 18-19. The nondelegation doctrine reflects the principle that Congress may not confer on the Executive Branch "powers which are strictly and exclusively legislative." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion). By contrast "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). Put simply, deciding whether and how to enforce the law is a quintessential exercise of *Executive* power that does not implicate the nondelegation doctrine. Thus, a prosecutor's choice to charge one criminal violation but not another does not "impermissibly delegate to the Executive Branch the Legislature's responsibility to fix criminal penalties." *United States v. Batchelder*, 442 U.S. 114, 125-26 (1979).

Axalta premises its nondelegation argument on a divided panel decision of the Fifth Circuit in *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022). The Supreme Court expressly declined to address that holding,

*Jarkesy*, 144 S. Ct. at 2127-28, which is incorrect as Judge Davis explained in his panel dissent, *Jarkesy*, 34 F.4th at 473-75 (Davis, J., dissenting), and as Judge Haynes reiterated in her dissent from denial of rehearing en banc, *Jarkesy v. SEC*, 51 F.4th 644, 645-46 (5th Cir. 2022) (Haynes, J., dissenting).  The *Jarkesy* panel majority asserted that the enforcement of the laws involved Congress's legislative power because it "alter[s] the legal rights, duties and relations of persons," who might receive a jury trial in district court but would not in an administrative proceeding.  34 F.4th at 461.  But that is true in many cases—the United States may choose to charge a criminal defendant with a petty misdemeanor rather than a felony.  That discretionary executive decision may effectively deprive the defendant of a right to a jury trial, *Baldwin v. New York*, 399 U.S. 66, 69-70 (1970), and the requirement for a grand jury, *United States v. Linares*, 921 F.2d 841, 844 (9th Cir. 1990), but has never been thought to implicate the nondelegation doctrine.  Similarly, the United States might choose to seek a legal remedy (money damages) or an equitable remedy (and injunction) in a district court suit.  Indeed, 49 U.S.C. § 5122(a) expressly contemplates that choice.  If only equitable relief were sought, there would be no Seventh Amendment right to a jury trial.  But there is no serious dispute that these

choices of how to enforce the law reflect the exercise of Executive—not Legislative—power.

## III.  The Secretary Constitutionally Appointed the ALJ

The Constitution's Appointments Clause provides that principal officers must be appointed by the President with Senate confirmation, and that Congress may vest the appointment of inferior officers—those who are supervised by principal officers—in the President, the courts, or Department Heads.  U.S. Const. art. II, § 2, cl. 2.  Congress has generally authorized Department Heads to appoint ALJs, 5 U.S.C. § 3105, and specifically has granted the Secretary of Transportation authority to appoint all officers within the Department, 49 U.S.C. § 323.  Pursuant to those authorities, Secretary Chao appointed Axalta's ALJ in 2019, JA62, well before the administrative proceeding began in 2021, JA185.  Thus, the ALJ had been constitutionally appointed.  *Edmond v. United States*, 520 U.S. 651, 654 (1997) (upholding similar appointment memorandum by the Secretary of Transportation).

Axalta does not assert that the appointment itself was defective, but rather contends that for an appointment to be truly constitutional "the public [must be] aware of which *specific* President or department head

appoints an agency adjudicator." Br. 21. But that requirement is satisfied here—the appointment order was signed by Secretary Chao.

Axalta also contends that the order was not sufficiently publicized at the time it was issued, but cites no precedent for this novel constitutional requirement, and we are aware of none. Agencies are not required to publish their appointments in the Federal Register, and agencies often do not publicize routine appointments of subordinate officials. Instead, Axalta cites purportedly internal legal advice as mandating that an appointment be accompanied by a degree of public ceremony. https://static.reuters.com /resources/media/editorial/20180723/ALJ--SGMEMO.pdf. Any internal guidance is of course not binding constitutional law, and in all events Axalta misreads the document it cites. Rather than laying out requirements, the document suggests that "it would be fitting for the [appointment] ratifications" of ALJs "to be accompanied by an appropriate degree of public ceremony and formality." *Id.* at 6. The document emphasized that "[t]hese steps are not strictly necessary," but would "underscore that the Department Head has satisfied the purposes of the Appointments Clause." *Id.* The document in no way suggests that a failure to inform the entire Nation of a single officer's appointment would "create doubt" about its constitutionality, as Axalta intimates. Br. 21.

Axalta also suggests that the ALJ's appointment order has remained inaccessible to the public. That is incorrect. The order is now and always has been available under the Freedom of Information Act. And here, when Axalta alleged that the ALJ had not been properly appointed and the Secretary was not adequately responsible for the ALJ's action, JA50, the ALJ promptly produced his appointment to put those concerns to rest, JA56-62.

## IV. Axalta's Challenge to ALJ Removal Restrictions Fails

Axalta also objects to the fact that the ALJ that conducted its hearing, like all ALJs, was removable only for "good cause." 5 U.S.C. § 7521(a). All four circuits to have considered whether a challenger was entitled to relief on such a claim have answered that question in the negative, concluding either that Section 7521(a) is constitutional or, even if not, that the plaintiff would not be entitled to enjoin or invalidate the challenged agency action on that basis. *See K&R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023); *Calcutt v. FDIC*, 37 F.4th 293, 317-20 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023) (per curiam); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1129-38 (9th Cir. 2021); *Leachco, Inc. v. Consumer Product Safety Commission*, 103 F.4th 748, 763-64 (10th Cir. 2024). This Court should reach the same result.

### A. Congress Constitutionally Provided that ALJs May Be Removed for "Good Cause"

**1.** For more than 130 years, the Supreme Court has recognized that nothing in the Constitution requires a Department Head who has been granted appointment authority by Congress to have unfettered discretion to remove his appointees. In *United States v. Perkins*, 116 U.S. 483 (1886), an inferior officer in the Navy challenged his removal without cause as unlawful, as Congress had provided that such inferior officers could be removed in peacetime only pursuant to a court-martial sentence. *Id.* at 483-84. The Supreme Court agreed, holding that it "ha[d] no doubt" that Congress "may limit and restrict the power of removal" for inferior officers. *Id.* at 485.

The Supreme Court has since reaffirmed that Congress may impose limitations on a Department Head's exercise of the removal power. In *Morrison v. Olson*, 487 U.S. 654 (1988), the Court upheld a "good cause" removal restriction for an independent counsel appointed to investigate and prosecute serious crimes committed by certain high-ranking executive officers. *Id.* at 685-93. *Morrison* did not decide "exactly what is encompassed within the term 'good cause,'" but stressed its understanding that "the Attorney General may remove an independent counsel for 'misconduct.'" *Id.* at 692. Through that removal authority, the Court

stated, the President "retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities." *Id.* Although the independent counsel exercised "discretion and judgment" in carrying out her responsibilities, the Court concluded that "the President's need to control the exercise of that discretion [was not] so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id.* at 691-92. And even Justice Scalia's dissent rejected the idea that inferior officers must be removable at will—as he explained, that "has never been the law." *Id.* at 724 n.4 (Scalia, J., dissenting) (arguing that the President must have "plenary power to remove principal officers" like the Attorney General, but that the Constitution "does not require that [the President] have plenary power to remove inferior officers").

Other recent Supreme Court decisions have likewise acknowledged Congress's power to regulate Department Heads' removal of inferior officers. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (acknowledging *Perkins* and *Morrison*); *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 493 (2010) (confirming that the Court "has upheld for-cause limitations" on removal of inferior officers). And in *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021),

the Supreme Court affirmatively chose to *restore* removal protections of executive branch adjudicators who perform functions similar to those of ALJs.  Although the court of appeals had invalidated those officers' removal restrictions to remedy an Appointments Clause violation, *id.* at 25-26 (plurality opinion), the Supreme Court severed a different portion of the statutory scheme, thereby preserving the adjudicators' removal protections, *id.; see also id.* at 44 (Breyer, J., concurring in the judgment in part and dissenting in part) (agreeing with plurality's choice of severance).

Of course, Congress does not have unlimited authority to shield officials wielding executive power from removal.  Under Article II, Congress may not impose any restriction that prevents the President from ensuring that the laws are faithfully executed or "deprive[s] the President of adequate control" over the official's exercise of executive power.  *Free Enterprise*, 561 U.S. at 508; *see also Morrison*, 487 U.S. at 658.  Within those bounds, Congress may regulate the conditions for removal of inferior officers.

**2.**  Under these precedents, the statute providing that ALJs can be removed "for good cause" readily satisfies constitutional requirements, particularly where the ALJ can be removed by the Secretary, who is removable at will by the President.  Nearly 80 years ago, Congress created

the positions now known as ALJs to serve as "semi-independent subordinate hearing officers" within agencies. *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 132, (1953) (quotation marks omitted). ALJs were afforded a "qualified right of decisional independence," *Nash v. Califano*, 613 F.2d 10, 15 (2d Cir. 1980), designed to rebut allegations that ALJs might be "mere tools of the agency," *Ramspeck*, 345 U.S. at 131. To that end, Congress has directed that an agency may remove an ALJ "only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). That "good cause" standard mirrors other longstanding statutory removal restrictions for adjudicators not afforded the protections of Article III judges. *See, e.g.*, Act of Feb. 24, 1855, ch. 122, 10 Stat. 612 (Court of Claims); Act of June 17, 1930, ch. 497, §§ 518, 646, 46 Stat. 590, 737-39, 762 (Customs Court and Court of Customs and Patent Appeals).

That said, agencies have plenary power to review and reverse ALJ decisions, 5 U.S.C. § 557(b), and parties to an FAA enforcement proceeding can request review by the FAA Administrator, 14 C.F.R. § 13.233(a), whose authority flows directly from the Secretary of Transportation, 49 C.F.R. § 1.83(d)(1). And under Section 7521(a)'s "good cause" standard, the

Secretary may remove an ALJ for refusing to follow binding legal or policy judgments announced by the agency, as well as for misconduct or substantially deficient job performance.

This design comports with constitutional requirements. As the Ninth Circuit explained in rejecting a materially identical challenge to the removal restrictions for ALJs within the Department of Labor, "ALJs are judges who make decisions that are subject to vacatur by people without tenure protection." *Decker Coal*, 8 F.4th at 1135. They also perform an "adjudicatory" function rather than "policymaking and enforcement functions" and "cannot sua sponte initiate investigations." *Id.* at 1133. Under that structure, the President "continues to enjoy an 'ability to execute the laws—by holding his subordinates accountable for their conduct.'" *Id.* at 1135; *see also Leachco*, 103 F.4th at 764 (rejecting similar ALJ removal challenge and "find[ing] the Ninth Circuit's analysis in *Decker Coal* persuasive"); *Calcutt*, 37 F.4th at 319 ("[W]e doubt Calcutt could establish a constitutional violation from the [FDIC] ALJ removal restrictions."), *rev'd on other grounds*, 598 U.S. 623 (2023) (per curiam); *but see Jarkesy*, 34 F.4th at 464 (concluding in a divided panel opinion that ALJ removal protections are unconstitutional, at least when applied to an

agency where the Department Head is understood to also have removal protections), *aff'd on other grounds*, 144 S. Ct. 2117.

**3.** Axalta errs in claiming that ALJs are unconstitutionally insulated from Presidential control on the theory that they have two levels of removal protection. Br. 23 (citing *Free Enterprise*, 561 U.S. at 506-07). There is a single layer of removal restriction between the ALJ and the President: The President may remove the Secretary at will, and the Secretary may remove the ALJ for good cause. 5 U.S.C. § 7521.

Axalta emphasizes that the Merit Systems Protection Board is charged with reviewing whether there is good cause for removal of an ALJ. *See* 5 U.S.C. § 7521(a). Board members are removable by the President "for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 1202(d). But the Board's role simply mirrors the role that courts traditionally play in reviewing claims of improper removal. Thus, in *Morrison*, the Supreme Court saw "no constitutional problem" in "judicial review of the removal decision" because the "possibility of judicial review does not inject the Judicial Branch into the removal decision, nor does it, by itself, put any additional burden on the President's exercise of executive authority." *Morrison*, 487 U.S. at 693 n.33. The same was true in *Perkins* as well, where it was solely for the federal courts to determine if the Navy officer

had been properly removed. 116 U.S. at 485. And if it is constitutional for a court—wholly beyond the control of the President—to adjudicate whether cause for removal has been demonstrated, it is constitutional for the more accountable Board to conduct the same adjudication.[7]

Even if the Merit Systems Protection Board were thought to provide a second layer of removal protection, Axalta's argument would still rest on a misreading of *Free Enterprise*, which "did not broadly declare all two-level for-cause protections for inferior officers unconstitutional." *Decker Coal*, 8 F.4th at 1132. On the contrary, *Free Enterprise* emphasized that it was not making a "general pronouncement[]" that "two levels of good-cause tenure" are always unconstitutional and should not "cast doubt on the use of what is colloquially known as the civil service system within independent agencies." 561 U.S. at 505-07. And the Court was explicit that its holding did "not address that subset of independent agency employees who serve as administrative law judges," who "perform adjudicative rather than enforcement or policymaking functions." *Id.* at 507 n.10.

---

[7] Under 5 U.S.C. § 7521, the Board does not make a policy judgment as to whether an ALJ should be removed, but instead limits its review to the agency's determination that good cause for removal exists. *See HHS v. Jarboe*, 2023 M.S.P.B. 22, ¶ 6 (2023); *SSA v. Levinson*, 2023 M.S.P.B. 20, ¶¶ 37-38 (2023).

## B. Axalta Fails to Demonstrate Any Prejudice From the Challenged Removal Restrictions

Axalta summarily asserts that the challenged removal restrictions render the agency proceedings "illegitimate" and urges that they "must be vacated." Br. 23. That is not correct. As the Supreme Court and this Court have explained, "actions taken by an improperly insulated" officer "are not 'void' and do not need to be 'ratified' unless a plaintiff can show that the removal provision harmed him." *CFPB v. National Collegiate Master Student Loan Trust*, 96 F.4th 599, 607 (3d Cir. 2024) (citing *Collins v. Yellen*, 594 U.S. 220, 259-60 (2021)). In other words, plaintiffs raising a removal challenge "are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision." *Id.* Simply pointing to an allegedly unconstitutional removal restriction is not enough. *Id.* at 614-15. And Axalta makes no attempt to demonstrate that the government would have declined to pursue this enforcement action if the ALJ had been removable at will. *Id.* at 615.

This Court's decision in *National Collegiate* is consistent with decisions of every other court of appeals to consider the question, all of which declined to enjoin or reverse agency action based on a removal challenge where there is no evidence that the removal restriction actually

48

prejudiced the plaintiff.  *Accord CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023); *K&R Contractors*, 86 F.4th at 149; *Community Financial Services Association of America, Ltd. v. CFPB*, 51 F.4th 616 632-33 (5th Cir. 2022), *rev'd on other grounds*, 601 U.S. 416 (2024); *Calcutt*, 37 F.4th at 318-20; *Kaufmann v. Kijakazi*, 32 F.4th 843, 849-50 (9th Cir. 2022); *Leachco*, 103 F.4th at 756-57.

## V. The Enforcement Action Is Timely

Axalta offered its package of paint for shipment in January 2017. JA130.  FAA enforcement staff issued Axalta a final notice of the proposed civil penalty in February 2021 and Axalta required an administrative hearing later that same month.  JA129.  By any measure, the administrative enforcement proceeding began within 5 years of Axalta's violation.  Thus, the enforcement proceeding complies with the 5-year time limit in 28 U.S.C. § 2462, which applies to "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture," unless another time limit is set by law.

Axalta mistakenly contends that the limitations period continued to run as the enforcement action was proceeding and that 5 years after Axalta's violation (in January 2022), "the government [became] time-barred from enforcing any civil penalty against Axalta," even if

administrative enforcement proceedings were still ongoing.  Br. 25.  That is

incorrect.  Under 49 U.S.C. § 5123(b), the Secretary may hold a hearing to

determine whether a person has violated the Act and whether civil penalties

are appropriate.  That is an administrative "proceeding for the enforcement

of" a civil penalty, 28 U.S.C. § 2462, and here it began within § 2462's five-

year time limit.

There is also mismatch between Axalta's reading of § 2462 and its

proposed remedy.  Even if that provision would bar the United States from

judicially enforcing a civil penalty against Axalta more than 5 years after the

violation occurred, that would not be a proper basis for setting aside the

challenged order.  At most, the implication of this argument is that if Axalta

refused to pay the $1,900 penalty, any district court suit initiated by the

United States to collect that penalty would be time-barred.  Br. 25.  But the

United States has not sought to judicially enforce the civil penalty order, so

there is no need for the Court to address in this petition for review (filed by

Axalta) whether such a future action would be time-barred.  The Court can

end its analysis there.

In any case, the government can still bring a timely action against

Axalta to enforce the administrative penalty.  Congress granted the

Attorney General a cause of action "to collect a civil penalty under this

section." 49 U.S.C. § 5123(d). The five-year statute of limitations for such an action are measured from the date that FAA "assessed a civil penalty." *FERC v. Vitol Inc.*, 79 F.4th 1059, 1063 (9th Cir. 2023). "Only then does the cause of action accrue" to collect the civil penalty, and "so only then does the statute of limitations begin to run." *Id.* In other words, "[u]ntil there is a civil penalty, a cause of action for [collecting] the penalty cannot exist. The claim becomes complete and present only upon the conclusion of the administrative proceeding." *Id. Accord FERC v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 899 (4th Cir. 2020) (explaining that § 2462's time-limits commence after administrative proceedings are completed).

Axalta roots its contrary argument in *Gabelli v. SEC*, 568 U.S. 442 (2013), but *Gabelli* "did not, as [Axalta] contend[s], adopt an unconditional ruling" that all government civil penalty enforcement "must face a fixed expiration date, five years from" the underlying violation. *Powhatan Energy Fund*, 949 F.3d at 899. Instead, *Gabelli* held that the SEC's time-limit for bringing an enforcement action ran from the date the underlying fraud occurred, not when it was discovered. 568 U.S. at 448. But "[c]rucially, the statute in *Gabelli* permitted the SEC to" sue immediately "without undertaking any prior administrative action." *Vitol*, 79 F.4th at 1064.

As the First Circuit explained, it is an "obvious proposition that a claim for 'enforcement' of an administrative penalty cannot possibly 'accrue' until there is a penalty to be enforced." *United States v. Meyer*, 808 F.2d 912, 914 (1st Cir. 1987). And "[o]bviously an administrative agency order must exist before the [government] can file a district court action to enforce it." *U.S. Department of Labor v. Old Ben Coal Co.*, 676 F.2d 259, 261 (7th Cir. 1982). Axalta relies on the Fifth Circuit's contrary decision in *United States v. Core Laboratories, Inc.*, 759 F.2d 480 (5th Cir. 1985), which held that both administrative and district court proceedings must be brought within 5 years. As the First and Ninth Circuits explained, *Core*'s reasoning is "unconvincing," *Meyer*, 808 F.2d at 913, and it has not been endorsed by any other court of appeals, *Vitol*, 79 F.4th at 1065. And *Core* did not cite or discuss the relevant statutory provisions requiring administrative proceedings to assess civil penalties or to sue in district court to recover those assessed penalties. 50 U.S.C. § 2410(c), (f) (1988).

## VI. The Agency Decision is Supported by Substantial Evidence, Reasonably Explained, and Consistent with Law

**A.** Axalta challenges the sufficiency of the administrative complaint, arguing that the ALJ erred when "he denied Axalta's motion to dismiss the Complaint." Br. 2; *see also* Br. 27 ("The Complaint did not allege that Axalta committed a 'knowing violation' of the" regulations). But

the complaint sufficiently alleges that Axalta violated both 49 C.F.R.

§§ 171.2(e) and 173.24(b)(1).  It alleged that Axalta "knowingly offered" a

shipment of paint to Federal Express "for transportation by air," JA15, and

that Axalta "offered the * * * shipment of hazardous material" when it "was

not properly packaged, and in the proper condition for shipment," JA16

(formatting altered).  Axalta thus offered the package for shipment and

"failed to ensure [that] the package was designed, constructed, maintained,

filled, its contents so limited, and closed, so that under" normal

transportation conditions there would "be no identifiable" leakage of paint

out of the package.  JA16.  Because of Axalta's failures to comply with the

regulations, the package leaked.  JA16.  *See also* Supp. App'x 7-18 (pictures

of the leak).

　　The complaint thus sufficiently alleges that Axalta violated 49 C.F.R.

§ 173.24(b)(1) by failing to ensure that the package was sufficiently secured

to prevent "release of hazardous materials to the environment."  It likewise

sufficiently alleges that Axalta violated 49 C.F.R. § 171.2(e) by offering paint

for transportation that  was not "packaged * * * and in condition for

shipment as required" by the Act's regulations.  *See also* 49 U.S.C.

§ 5123(a)(1)(A)-(B) (defining knowledge as both actual knowledge and

when "a reasonable person acting in the circumstances and exercising

reasonable care would have that knowledge"). Thus, to act "knowingly" under the Act, a person must have "knowledge of the facts giving rise to the violation" not necessarily an "intent to violate the law." *National Power Corp. v. FAA*, 864 F.3d 529, 532-33 (7th Cir. 2017) (holding that this interpretation comports "with the plain language" of § 5123(a)).

Axalta does not contest that the package leaked, and it does not contest that Axalta's employees prepared the paint for shipment by air transport. *See* Supp. App'x 6 (declaration of hazardous materials for the shipment prepared by Axalta). Instead, Axalta argues that the complaint failed to adequately allege that Axalta "should have known the shipment was not compliant with" the Hazardous Materials Regulations. Br. 33. As the FAA Administrator explained, the complaint does so. JA117-18. Under the applicable standard, administrative "[c]omplaints are sufficient if the respondent understood the issue and was afforded full opportunity to justify its conduct during the course of the litigation." JA117 (citing *Aloha Airlines, Inc. v. Civil Aeronautics Board*, 598 F.2d 250, 262 (D.C. Cir. 1979), quotation marks omitted). The complaint alleged "that Axalta 'knowingly offered' a can of paint for shipment" and that Axalta knew that "the shipment contained paint." JA117-18. Axalta is "presumed to be aware of the regulation[s]" concerning "dangerous or deleterious devices or

products." *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 565 (1971). Thus, when Axalta knowingly prepared and offered its package for shipment—and the package leaked in violation of the regulations—the complaint adequately repeated those facts to state a claim. No additional "magic words" were required. JA117 (quoting *Stanton v. Elliott*, 25 F.4th 227, 238 (4th Cir. 2022)).

The evidence produced at the hearing confirmed the complaint's allegations. Federal Express's incident report indicated that "the paint can's closure had failed," JA132 & n.20, resulting in a leak caused by "human error," JA140, JA296. The FAA inspector testified that he visually inspected the package after it had leaked and "didn't see anything that would lead me to believe that there was anything that would have been outside normal transportation." JA241. Instead, he identified the cause of the leak as "the fact that one of the retaining clips [was] disengaged," and not securing the paint cannister's lid. JA223-24; Supp. App'x 12-15 (photos). The cannister was surrounded by a "barrier bag," but that too leaked. JA236; Supp. App'x 10. The FAA inspector could not determine "specifically if there was a hole in the bag * * * or if the bag just wasn't tied. I don't know. It just—it escaped the bag." JA236. The evidence thus showed that Axalta prepared its package in a way that failed to prevent

paint leaking out and into the cargo hold of the aircraft, and Axalta knew or should have known how it prepared its own package.

Axalta contends that it could not have reasonably known that its preparation of the package failed to comply with the applicable regulations, citing *Contact Courier Services, Inc. v. Research & Special Programs Administration*, 924 F.2d 112 (7th Cir. 1991). But the Seventh Circuit there considered a very different scenario—whether the respondent could be held to have constructive knowledge of a violation when it failed to discover that its independent contractors improperly stored radioactive materials. *Id.* at 113 (explaining that there was "some dispute" about whether the storage was done by independent contractors or the company's employees, but "the Department did not discuss the question, so we must assume that" they were independent contractors). Because the then-existing regulations did not "require[] a carrier to monitor the work of its independent contractors," knowledge could not be imputed based on the record as it stood. *Id.* at 114. Accordingly, the court remanded the case to the agency because the record was "sufficient to support a penalty, if the persons who" placed the radioactive containers "were [the company's] employees," which the agency should "address in the first instance." *Id.* at 116. Here, there is no dispute

that the package was prepared by Axalta's employees—the evidence thus supports a penalty.

**B.** As its eighth separate argument for invaliding the order, Axalta alleges that the ALJ violated due process by *sua sponte* concluding that Axalta committed additional violations. Br. 34-39. That is not what happened. The ALJ and the FAA Administrator imposed civil penalties on Axalta because the company violated 49 C.F.R. §§ 171.2(e) and 173.24(b)(1), as alleged in the administrative complaint. JA16, JA119, JA137.

FAA enforcement staff's theory of liability was that Axalta had not properly packaged and closed the paint to prevent a leak. Axalta understood that theory, explaining at the start of the hearing that "[t]he complaint says the parcel was not properly packaged" because it "has to be closed in a way that there is no release to the environment." JA209. During closing arguments, the enforcement attorney argued that "the package was not properly done." JA282. The ALJ then asked the attorney to clarify that argument, asking "what regulation do I look at for this closure" requirement, because "in fairness to the regulated public, where is that—where is that in the regulation?" JA282-83. Enforcement counsel initially represented that the requirement came from "packaging instructions for each container[]" and was not in regulations, JA283, but

later corrected himself and pointed the ALJ to 49 C.F.R. § 173.27(d),

JA304.  That regulation requires a package to be closed in a way that

"adequately resist[s]" normal air transportation, and that the inner package

for liquids (here a metal container) "must be held securely, tightly and

effectively in place by secondary means."  49 C.F.R. § 173.27(d).  The

regulation listed examples of such secondary methods as "[a]dhesive tape,

friction sleeves," and "locking rings," and clarified that regardless of the

secondary method to close the container, it must be designed so that "it is

unlikely that it can be incorrectly or incompletely closed."  *Id.*  And for

Axalta's package (classified as Packing Group II), if a secondary closure

method did not work or was impracticable, this requirement "may be

satisfied by securely closing the inner packaging and placing it in a

leakproof liner."  *Id.* § 173.27(d)(2).

Axalta's counsel asked whether this regulation had been cited in the

complaint; the ALJ noted Axalta's objection and explained that he would

"look at whether that's alleged and needs to be alleged in the proper

fashion."  JA304.  The ALJ then asked both sides if they saw any need for

post-hearing briefs, and both sides agreed that was not necessary.  JA304-

05.

The ALJ ultimately determined that Axalta had violated 49 C.F.R. § 171.2(e), which required Axalta to package the paint "as required or authorized by applicable requirements of this subchapter," *i.e.*, all the Hazardous Material Regulations, including § 173.27(d). JA133. That decision was amply supported by the evidence. Axalta used a friction lid to close the metal cannister, but it came loose when its metal fasteners broke. JA142; Supp. App'x 12-15. Federal Express's incident report indicated that this kind of air shipment is generally secured with a ring lock, which was not used here. JA142. And although Axalta placed the paint in a plastic bag, that bag was not "leakproof." 49 C.F.R. § 173.27(d)(2); *see* Supp. App'x 7-11.

The FAA Administrator affirmed this conclusion, explaining that "Section 171.2(e) is a general regulation that expressly prohibits the transportation of hazardous material not packaged adequately in accordance with" the Hazardous Material Regulations. JA124. Thus, based "on the plain and ordinary language of § 171.2(e)," Axalta's failure to secure its package as required by § 173.27(d) "automatically resulted in a violation of § 171.2(e)." JA124.

On this record, Axalta fails to identify anything suggesting that the ALJ "accused Axalta" of committing additional violations. Br. 34. FAA

enforcement staff pursued a theory that Axalta failed to properly close its package of paint; all understood the substance of that theory and the ALJ asked the enforcement attorney for the regulatory citation for this requirement. The attorney provided it, and the ALJ granted an opportunity for both sides to present additional briefing. Axalta cites no precedent where similar circumstances have violated due process.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

JOSHUA M. SALZMAN
*/s/ Daniel Aguilar*
DANIEL AGUILAR
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5432*
Daniel.J.Aguilar@usdoj.gov

September 2024

# COMBINED CERTIFICATIONS

1.      Government counsel are not required to be members of the bar of this Court.

2.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,492 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Georgia 14-point font, a proportionally spaced typeface.

3.      On September 30, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

4.      The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5.      This document was scanned for viruses using CrowdStrike Falcon Sensor, and no virus was detected.


 */s/ Daniel Aguilar*
Daniel Aguilar

# ADDENDUM

# TABLE OF CONTENTS

U.S. Const. art. II, § 2, cl. 2....................................................Add. 1

5 U.S.C. § 7521.......................................................................Add. 1

28 U.S.C. § 2462....................................................................Add. 2

49 U.S.C. § 5101....................................................................Add. 2

49 U.S.C. § 5103 ...................................................................Add. 2

49 U.S.C. § 5122....................................................................Add. 4

49 U.S.C. § 5123....................................................................Add. 5

49 C.F.R. § 171.2(a)-(e).........................................................Add. 8

49 C.F.R. § 172.101 ..............................................................Add. 9

49 C.F.R. § 173.24(a)-(b).......................................................Add. 25

49 C.F.R. § 173.27(a)-(d).......................................................Add. 25

**U.S. Const. art. II, § 2, cl. 2.**

[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

**5 U.S.C. § 7521.  Actions against administrative law judges**

**(a)** An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board.

**(b)** The actions covered by this section are--

    **(1)** a removal;

    **(2)** a suspension;

    **(3)** a reduction in grade;

    **(4)** a reduction in pay; and

    **(5)** a furlough of 30 days or less;

but do not include--

    **(A)** a suspension or removal under section 7532 of this title;

    **(B)** a reduction-in-force action under section 3502 of this title; or

    **(C)** any action initiated under section 1215 of this title.

## 28 U.S.C. § 2462.  Time for commencing proceedings

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.


## 49 U.S.C. § 5101.  Purpose

The purpose of this chapter is to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce.


## 49 U.S.C. § 5103. General regulatory authority

**(a) Designating material as hazardous.**--The Secretary shall designate material (including an explosive, radioactive material, infectious substance, flammable or combustible liquid, solid, or gas, toxic, oxidizing, or corrosive material, and compressed gas) or a group or class of material as hazardous when the Secretary determines that transporting the material in commerce in a particular amount and form may pose an unreasonable risk to health and safety or property.

**(b) Regulations for safe transportation.—**

**(1)** The Secretary shall prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce. The regulations--

**(A)** apply to a person who--

**(i)** transports hazardous material in commerce;

**(ii)** causes hazardous material to be transported in commerce;

**(iii)** designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging

component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce;

**(iv)** prepares or accepts hazardous material for transportation in commerce;

**(v)** is responsible for the safety of transporting hazardous material in commerce;

**(vi)** certifies compliance with any requirement under this chapter; or

**(vii)** misrepresents whether such person is engaged in any activity under clause (i) through (vi); and

**(B)** shall govern safety aspects, including security, of the transportation of hazardous material the Secretary considers appropriate.

**(2)** A proceeding to prescribe the regulations must be conducted under section 553 of title 5, including an opportunity for informal oral presentation.

**(c) Federally declared disasters and emergencies.**--

**(1) In general.**--The Secretary may by order waive compliance with any part of an applicable standard prescribed under this chapter without prior notice and comment and on terms the Secretary considers appropriate if the Secretary determines that--

**(A)** it is in the public interest to grant the waiver;

**(B)** the waiver is not inconsistent with the safety of transporting hazardous materials; and

**(C)** the waiver is necessary to facilitate the safe movement of hazardous materials into, from, and within an area of a major disaster or emergency that has been declared under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.).

**(2) Period of waiver.**--A waiver under this subsection may be issued for a period of not more than 60 days and may be renewed upon application to the Secretary only after notice and an opportunity for a

hearing on the waiver. The Secretary shall immediately revoke the waiver if continuation of the waiver would not be consistent with the goals and objectives of this chapter.

**(3) Statement of reasons.**--The Secretary shall include in any order issued under this section the reasons for granting the waiver.

**(d) Consultation.**--When prescribing a security regulation or issuing a security order that affects the safety of the transportation of hazardous material, the Secretary of Homeland Security shall consult with the Secretary of Transportation.

**(e) Biennial report.**--The Secretary of Transportation shall submit to the Committee on Transportation and Infrastructure of the House of Representatives and the Senate Committee on Commerce, Science, and Transportation a biennial report providing information on whether the Secretary has designated as hazardous materials for purposes of chapter 51 of such title all by-products of the methamphetamine-production process that are known by the Secretary to pose an unreasonable risk to health and safety or property when transported in commerce in a particular amount and form.


### 49 U.S.C. § 5122. Enforcement

**(a) General.**--At the request of the Secretary, the Attorney General may bring a civil action in an appropriate district court of the United States to enforce this chapter or a regulation prescribed or order, special permit, or approval issued under this chapter. The court may award appropriate relief, including a temporary or permanent injunction, punitive damages, and assessment of civil penalties considering the same penalty amounts and factors as prescribed for the Secretary in an administrative case under section 5123.

**(b) Imminent hazards.—**

**(1)** If the Secretary has reason to believe that an imminent hazard exists, the Secretary may bring a civil action in an appropriate district court of the United States--

**(A)** to suspend or restrict the transportation of the hazardous material responsible for the hazard; or

**(B)** to eliminate or mitigate the hazard.

**(2)** On request of the Secretary, the Attorney General shall bring an action under paragraph (1) of this subsection.

## (c) Withholding of clearance.—

**(1)** If any owner, operator, or individual in charge of a vessel is liable for a civil penalty under section 5123 of this title or for a fine under section 5124 of this title, or if reasonable cause exists to believe that such owner, operator, or individual in charge may be subject to such a civil penalty or fine, the Secretary of Homeland Security, upon the request of the Secretary, shall with respect to such vessel refuse or revoke any clearance required by section 60105 of title 46.

**(2)** Clearance refused or revoked under this subsection may be granted upon the filing of a bond or other surety satisfactory to the Secretary.


## 49 U.S.C. § 5123. Civil penalty

## (a) Penalty.—

**(1)** A person that knowingly violates this chapter or a regulation, order, special permit, or approval issued under this chapter is liable to the United States Government for a civil penalty of not more than $75,000 for each violation. A person acts knowingly when--

**(A)** the person has actual knowledge of the facts giving rise to the violation; or

**(B)** a reasonable person acting in the circumstances and exercising reasonable care would have that knowledge.

**(2)** If the Secretary finds that a violation under paragraph (1) results in death, serious illness, or severe injury to any person or substantial destruction of property, the Secretary may increase the amount of the civil penalty for such violation to not more than $175,000.

**(3)** If the violation is related to training, a person described in paragraph (1) shall be liable for a civil penalty of at least $450.

**(4)** A separate violation occurs for each day the violation, committed by a person that transports or causes to be transported hazardous material, continues.

**(b) Hearing requirement.**--The Secretary may find that a person has violated this chapter or a regulation prescribed or order, special permit, or approval issued under this chapter only after notice and an opportunity for a hearing. The Secretary shall impose a penalty under this section by giving the person written notice of the amount of the penalty.

**(c) Penalty considerations.**--In determining the amount of a civil penalty under this section, the Secretary shall consider--

**(1)** the nature, circumstances, extent, and gravity of the violation;

**(2)** with respect to the violator, the degree of culpability, any history of prior violations, the ability to pay, and any effect on the ability to continue to do business; and

**(3)** other matters that justice requires.

**(d) Civil actions to collect.**--The Attorney General may bring a civil action in an appropriate district court of the United States to collect a civil penalty under this section and any accrued interest on the civil penalty as calculated in accordance with section 1005 of the Oil Pollution Act of 1990 (33 U.S.C. 2705). In the civil action, the amount and appropriateness of the civil penalty shall not be subject to review.

**(e) Compromise.**--The Secretary may compromise the amount of a civil penalty imposed under this section before referral to the Attorney General.

**(f) Setoff.**--The Government may deduct the amount of a civil penalty imposed or compromised under this section from amounts it owes the person liable for the penalty.

**(g) Depositing amounts collected.**--Amounts collected under this section shall be deposited in the Treasury as miscellaneous receipts.

**(h) Penalty for obstruction of inspections and investigations.**--

**(1)** The Secretary may impose a penalty on a person who obstructs or prevents the Secretary from carrying out inspections or investigations under subsection (c) or (i) of section 5121.

**(2)** For the purposes of this subsection, the term "obstructs" means actions that were known, or reasonably should have been known, to prevent, hinder, or impede an investigation.

## (i) Prohibition on hazardous material operations after nonpayment of penalties.--

**(1) In general.**--Except as provided under paragraph (2), a person subject to the jurisdiction of the Secretary under this chapter who fails to pay a civil penalty assessed under this chapter, or fails to arrange and abide by an acceptable payment plan for such civil penalty, may not conduct any activity regulated under this chapter beginning on the 91st day after the date specified by order of the Secretary for payment of such penalty unless the person has filed a formal administrative or judicial appeal of the penalty.

**(2) Exception.**--Paragraph (1) shall not apply to any person who is unable to pay a civil penalty because such person is a debtor in a case under chapter 11 of title 11.

**(3) Rulemaking.**--Not later than 2 years after the date of enactment of this subsection, the Secretary, after providing notice and an opportunity for public comment, shall issue regulations that--

**(A)** set forth procedures to require a person who is delinquent in paying civil penalties to cease any activity regulated under this chapter until payment has been made or an acceptable payment plan has been arranged; and

**(B)** ensures that the person described in subparagraph (A)--

**(i)** is notified in writing; and

**(ii)** is given an opportunity to respond before the person is required to cease the activity.

**49 C.F.R. § 171.2.  General requirements.**

(a) Each person who performs a function covered by this subchapter must perform that function in accordance with this subchapter.

(b) Each person who offers a hazardous material for transportation in commerce must comply with all applicable requirements of this subchapter, or an exemption or special permit, approval, or registration issued under this subchapter or under subchapter A of this chapter. There may be more than one offeror of a shipment of hazardous materials. Each offeror is responsible for complying with the requirements of this subchapter, or an exemption or special permit, approval, or registration issued under this subchapter or subchapter A of this chapter, with respect to any pre-transportation function that it performs or is required to perform; however, each offeror is responsible only for the specific pre-transportation functions that it performs or is required to perform, and each offeror may rely on information provided by another offeror, unless that offeror knows or, a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the information provided by the other offeror is incorrect.

(c) Each person who performs a function covered by or having an effect on a specification or activity prescribed in part 178, 179, or 180 of this subchapter, an approval issued under this subchapter, or an exemption or special permit issued under subchapter A of this chapter, must perform the function in accordance with that specification, approval, an exemption or special permit, as appropriate.

(d) No person may offer or accept a hazardous material for transportation in commerce or transport a hazardous material in commerce unless that person is registered in conformance with subpart G of part 107 of this chapter, if applicable.

(e) No person may offer or accept a hazardous material for transportation in commerce unless the hazardous material is properly classed, described, packaged, marked, labeled, and in condition for shipment as required or authorized by applicable requirements of this subchapter or an exemption or special permit, approval, or registration issued under this subchapter or subchapter A of this chapter.

\*   \*   \*

**49 C.F.R. § 172.101.  Purpose and use of the hazardous materials table.**

(a) The Hazardous Materials Table (Table) in this section designates the materials listed therein as hazardous materials for the purpose of transportation of those materials. For each listed material, the Table identifies the hazard class or specifies that the material is forbidden in transportation, and gives the proper shipping name or directs the user to the preferred proper shipping name. In addition, the Table specifies or references requirements in this subchapter pertaining to labeling, packaging, quantity limits aboard aircraft and stowage of hazardous materials aboard vessels.

(b) Column 1: Symbols. Column 1 of the Table contains six symbols ("+", "A", "D", "G", "I" and "W") as follows:

(1) The plus (+) sign fixes the proper shipping name, hazard class and packing group for that entry without regard to whether the material meets the definition of that class, packing group or any other hazard class definition. When the plus sign is assigned to a proper shipping name in Column (1) of the § 172.101 Table, it means that the material is known to pose a risk to humans. When a plus sign is assigned to mixtures or solutions containing a material where the hazard to humans is significantly different from that of the pure material or where no hazard to humans is posed, the material may be described using an alternative shipping name that represents the hazards posed by the material. An appropriate alternate proper shipping name and hazard class may be authorized by the Associate Administrator.

(2) The letter "A" denotes a material that is subject to the requirements of this subchapter only when offered or intended for transportation by aircraft, unless the material is a hazardous substance or a hazardous waste. A shipping description entry preceded by an "A" may be used to describe a material for other modes of transportation provided all applicable requirements for the entry are met.

(3) The letter "D" identifies proper shipping names which are appropriate for describing materials for domestic transportation but may be inappropriate for international transportation under the provisions of international regulations (e.g., IMO, ICAO). An alternate

proper shipping name may be selected when either domestic or international transportation is involved.

(4) The letter "G" identifies proper shipping names for which one or more technical names of the hazardous material must be entered in parentheses, in association with the basic description. (See § 172.203(k).)

(5) The letter "I" identifies proper shipping names which are appropriate for describing materials in international transportation. An alternate proper shipping name may be selected when only domestic transportation is involved.

(6) The letter "W" denotes a material that is subject to the requirements of this subchapter only when offered or intended for transportation by vessel, unless the material is a hazardous substance or a hazardous waste. A shipping description entry preceded by a "W" may be used to describe a material for other modes of transportation provided all applicable requirements for the entry are met.

(c) Column 2: Hazardous materials descriptions and proper shipping names. Column 2 lists the hazardous materials descriptions and proper shipping names of materials designated as hazardous materials. Modification of a proper shipping name may otherwise be required or authorized by this section. Proper shipping names are limited to those shown in Roman type (not italics).

(1) Proper shipping names may be used in the singular or plural and in either capital or lower case letters. Words may be alternatively spelled in the same manner as they appear in the ICAO Technical Instructions or the IMDG Code. For example "aluminum" may be spelled "aluminium" and "sulfur" may be spelled "sulphur". However, the word "inflammable" may not be used in place of the word "flammable".

(2) Punctuation marks and words in italics are not part of the proper shipping name, but may be used in addition to the proper shipping name. The word "or" in italics indicates that there is a choice of terms in the sequence that may alternately be used as the proper shipping name or as part of the proper shipping name, as appropriate. For example, for the hazardous materials description "Carbon dioxide, solid or Dry ice" either "Carbon dioxide, solid" or "Dry ice" may be used as the proper shipping name; and for the hazardous materials description "Articles,

pressurized pneumatic or hydraulic," either "Articles, pressurized pneumatic" or "Articles, pressurized hydraulic" may be used as the proper shipping name.

(3) The word "poison" or "poisonous" may be used interchangeably with the word "toxic" when only domestic transportation is involved. The abbreviation "n.o.i." or "n.o.i.b.n." may be used interchangeably with "n.o.s.".

(4) Except for hazardous wastes, when qualifying words are used as part of the proper shipping name, their sequence in the package markings and shipping paper description is optional. However, the entry in the Table reflects the preferred sequence.

(5) When one entry references another entry by use of the word "see", if both names are in Roman type, either name may be used as the proper shipping name (e.g., Ethyl alcohol, see Ethanol).

(6) When a proper shipping name includes a concentration range as part of the shipping description, the actual concentration, if it is within the range stated, may be used in place of the concentration range. For example, an aqueous solution of hydrogen peroxide containing 30 percent peroxide may be described as "Hydrogen peroxide, aqueous solution with not less than 20 percent but not more than 40 percent hydrogen peroxide" or "Hydrogen peroxide, aqueous solution with 30 percent hydrogen peroxide." Also, the percent sign (%) may be used in place of the word "percent" when words in italics containing the word "percent" are used in addition to the proper shipping name.

(7) Use of the prefix "mono" is optional in any shipping name, when appropriate. Thus, Iodine monochloride may be used interchangeably with Iodine chloride. In "Glycerol alpha-monochlorohydrin" the term "mono" is considered a prefix to the term "chlorohydrin" and may be deleted.

(8) Use of the word "liquid" or "solid". The word "liquid" or "solid" may be added to a proper shipping name when a hazardous material specifically listed by name may, due to differing physical states, be a liquid or solid. When the packaging specified in Column 8 is inappropriate for the physical state of the material, the table provided in paragraph (i)(4) of this section should be used to determine the appropriate packaging section.

(9) Hazardous wastes. If the word "waste" is not included in the hazardous material description in Column 2 of the Table, the proper shipping name for a hazardous waste (as defined in § 171.8 of this subchapter), shall include the word "Waste" preceding the proper shipping name of the material. For example: Waste acetone.

(10) Mixtures and solutions.

(i) A mixture or solution meeting the definition of one or more hazard class that is not identified specifically by name, comprised of a single predominant hazardous material identified in the Table by technical name and one or more hazardous and/or non-hazardous material, must be described using the proper shipping name of the hazardous material and the qualifying word "mixture" or "solution", as appropriate, unless—

(A) Except as provided in § 172.101(i)(4) the packaging specified in Column 8 is inappropriate to the physical state of the material;

(B) The shipping description indicates that the proper shipping name applies only to the pure or technically pure hazardous material;

(C) The hazard class, packing group, or subsidiary hazard of the mixture or solution is different from that specified for the entry;

(D) There is a significant change in the measures to be taken in emergencies;

(E) The material is identified by special provision in Column 7 of the § 172.101 Table as a material poisonous by inhalation; however, it no longer meets the definition of poisonous by inhalation or it falls within a different hazard zone than that specified in the special provision; or

(F) The material can be appropriately described by a shipping name that describes its intended application, such as "Coating solution", "Extracts, flavoring" or "Compound, cleaning liquid."

(ii) If one or more of the conditions in paragraphs (c)(10)(i)(A) through (F) of this section is satisfied then the proper shipping name selection process in (c)(12)(ii) must be used.

(iii) A mixture or solution meeting the definition of one or more hazard class that is not identified in the Table specifically by name, comprised of two or more hazardous materials in the same hazard class, must be described using an appropriate shipping description (e.g., "Flammable liquid, n.o.s."). The name that most appropriately describes the material shall be used; e.g., an alcohol not listed by its technical name in the Table shall be described as "Alcohol, n.o.s." rather than "Flammable liquid, n.o.s.". Some mixtures may be more appropriately described according to their application, such as "Coating solution" or "Extracts, flavoring liquid" rather than by an n.o.s. entry. Under the provisions of subparts C and D of this part, the technical names of at least two components most predominately contributing to the hazards of the mixture or solution may be required in association with the proper shipping name.

(11) Except for a material subject to or prohibited by § 173.21, § 173.54, § 173.56(d), § 173.56(e), § 173.224(c) or § 173.225(b) of this subchapter, a material that is considered to be a hazardous waste or a sample of a material for which the hazard class is uncertain and must be determined by testing may be assigned a tentative proper shipping name, hazard class, identification number and packing group, if applicable, based on the shipper's tentative determination according to:

(i) Defining criteria in this subchapter;

(ii) The hazard precedence prescribed in § 173.2a of this subchapter;

(iii) The shipper's knowledge of the material;

(iv) In addition to paragraphs (c)(11)(i) through (iii) of this section, for a sample of a material other than a waste, the following must be met:

(A) Except when the word "Sample" already appears in the proper shipping name, the word "Sample" must appear as part of the proper shipping name or in association with the basic description on the shipping paper.

(B) When the proper shipping description for a sample is assigned a "G" in Column (1) of the § 172.101 Table, and the primary constituent(s) for which the tentative classification is based are not

known, the provisions requiring a technical name for the constituent(s) do not apply; and

(C) A sample must be transported in a combination packaging that conforms to the requirements of this subchapter that are applicable to the tentative packing group assigned, and may not exceed a net mass of 2.5 kg (5.5 pounds) per package.

Note to paragraph (c)(11): For the transportation of samples of self-reactive materials, organic peroxides, explosives or lighters, see § 173.224(c)(3), § 173.225(c)(2), § 173.56(d) or § 173.308(b)(2) of this subchapter, respectively.

(12) Except when the proper shipping name in the Table is preceded by a plus (+)—

(i) If it is specifically determined that a material meets the definition of a hazard class, packing group or hazard zone, other than the class, packing group or hazard zone shown in association with the proper shipping name, or does not meet the defining criteria for a subsidiary hazard shown in Column 6 of the Table, the material shall be described by an appropriate proper shipping name listed in association with the correct hazard class, packing group, hazard zone, or subsidiary hazard for the material.

(ii) Generic or n.o.s. descriptions. If an appropriate technical name is not shown in the Table, selection of a proper shipping name shall be made from the generic or n.o.s. descriptions corresponding to the specific hazard class, packing group, hazard zone, or subsidiary hazard, if any, for the material. The name that most appropriately describes the material shall be used, e.g., an alcohol not listed by its technical name in the Table shall be described as "Alcohol, n.o.s." rather than "Flammable liquid, n.o.s." Some mixtures may be more appropriately described according to their application, such as "Coating solution" or "Extracts, liquid, for flavor or aroma," rather than by an n.o.s. entry, such as "Flammable liquid, n.o.s." It should be noted, however, that an n.o.s. description as a proper shipping name may not provide sufficient information for shipping papers and package markings. Under the provisions of subparts C and D of this part, the technical name of one or more constituents that makes the

product a hazardous material may be required in association with the proper shipping name.

(iii) Multiple hazard materials. If a material meets the definition of more than one hazard class, and is not identified in the Table specifically by name (e.g., acetyl chloride), the hazard class of the material shall be determined by using the precedence specified in § 173.2a of this subchapter, and an appropriate shipping description (e.g., "Flammable liquid, corrosive n.o.s.") shall be selected as described in paragraph (c)(12)(ii) of this section.

(iv) If it is specifically determined that a material is not a forbidden material and does not meet the definition of any hazard class, the material is not a hazardous material.

(13) Self-reactive materials and organic peroxides. A generic proper shipping name for a self-reactive material or an organic peroxide, as listed in Column 2 of the Table, must be selected based on the material's technical name and concentration, in accordance with the provisions of §§ 173.224 or 173.225 of this subchapter, respectively.

(14) A proper shipping name that describes all isomers of a material may be used to identify any isomer of that material if the isomer meets criteria for the same hazard class or division, subsidiary risk(s) and packing group, unless the isomer is specifically identified in the Table.

(15) Unless a hydrate is specifically listed in the Table, a proper shipping name for the equivalent anhydrous substance may be used, if the hydrate meets the same hazard class or division, subsidiary risk(s) and packing group.

(16) Unless it is already included in the proper shipping name in the § 172.101 Table, the qualifying words "liquid" or "solid" may be added in association with the proper shipping name when a hazardous material specifically listed by name in the § 172.101 Table may, due to the differing physical states of the various isomers of the material, be either a liquid or a solid (for example "Dinitrotoluenes, liquid" and "Dinitrotoluenes, solid"). Use of the words "liquid" or "solid" is subject to the limitations specified for the use of the words "mixture" or "solution" in paragraph (c)(10) of this section. The qualifying word "molten" may be added in association with the proper shipping name when a hazardous material, which is a solid in accordance with the

definition in § 171.8 of this subchapter, is offered for transportation in the molten state (for example, "Alkylphenols, solid, n.o.s., molten").

(17) Unless it is already included in the proper shipping name in the § 172.101 Table, the qualifying word "stabilized" may be added in association with the proper shipping name, as appropriate, where without stabilization the substance would be forbidden for transportation according to § 173.21(f) of this subchapter.

(d) Column 3: Hazard class or Division. Column 3 contains a designation of the hazard class or division corresponding to each proper shipping name, or the word "Forbidden".

(1) A material for which the entry in this column is "Forbidden" may not be offered for transportation or transported. This prohibition does not apply if the material is diluted, stabilized or incorporated in a device and it is classed in accordance with the definitions of hazardous materials contained in part 173 of this subchapter.

(2) When a reevaluation of test data or new data indicates a need to modify the "Forbidden" designation or the hazard class or packing group specified for a material specifically identified in the Table, this data should be submitted to the Associate Administrator.

(3) A basic description of each hazard class and the section reference for class definitions appear in § 173.2 of this subchapter.

(4) Each reference to a Class 3 material is modified to read "Combustible liquid" when that material is reclassified in accordance with § 173.150(e) or (f) of this subchapter or has a flash point above 60 °C (140 °F) but below 93 °C (200 °F).

(e) Column 4: Identification number. Column 4 lists the identification number assigned to each proper shipping name. Those preceded by the letters "UN" are associated with proper shipping names considered appropriate for international transportation as well as domestic transportation. Those preceded by the letters "NA" are associated with proper shipping names not recognized for transportation outside of the United States. Identification numbers in the "NA9000" series are associated with proper shipping names not appropriately covered by international hazardous materials (dangerous goods) transportation standards, or not appropriately addressed by international transportation

standards for emergency response information purposes, except for transportation in the United States. Those preceded by the letters "ID" are associated with proper shipping names recognized by the ICAO Technical Instructions (see § 171.7 of this subchapter for availability).

(f) Column 5: Packing group. Column 5 specifies one or more packing groups assigned to a material corresponding to the proper shipping name and hazard class for that material. Class 2, Class 7, and Division 6.2 do not have packing groups. Articles in classes other than Class 1 are not assigned to packing groups. For packing purposes, any requirement for a specific packaging performance level is set out in the applicable packing authorizations of part 173. Packing Groups I, II, and III indicate the degree of danger presented by the material is great, medium, or minor, respectively. If more than one packing group is indicated for an entry, the packing group for the hazardous material is determined using the criteria for assignment of packing groups specified in subpart D of part 173. When a reevaluation of test data or new data indicates a need to modify the specified packing group(s), the data should be submitted to the Associate Administrator. Each reference in this column to a material that is a hazardous waste or a hazardous substance, and whose proper shipping name preceded in Column 1 of the Table by the letter "A" or "W," is modified to read "III" on those occasions when the material is offered for transportation or transported by a mode in which its transportation is not otherwise subject to requirements of this subchapter.

(g) Column 6: Labels. Column 6 specifies codes which represent the hazard warning labels required for a package filled with a material conforming to the associated hazard class and proper shipping name, unless the package is otherwise excepted from labeling by a provision in subpart E of this part, or part 173 of this subchapter. The first code is indicative of the primary hazard of the material. Additional label codes are indicative of subsidiary hazards. Provisions in § 172.402 may require that a label other than that specified in Column 6 be affixed to the package in addition to that specified in Column 6. No label is required for a material classed as a combustible liquid or for a Class 3 material that is reclassed as a combustible liquid. For "Empty" label requirements, see § 173.428 of this subchapter. The codes contained in Column 6 are defined according to the following table:

| Label Substitution Table | |
|---|---|
| Label code | Label name |
| 1 | Explosive |
| 1.1 | Explosive 1.1 |
| 1.2 | Explosive 1.2 |
| 1.3 | Explosive 1.3 |
| 1.4 | Explosive 1.4 |
| 1.5 | Explosive 1.5 |
| 1.6 | Explosive 1.6 |
| 2.1 | Flammable Gas |
| 2.2 | Non-Flammable Gas |
| 2.3 | Poison Gas |
| 3 | Flammable Liquid |
| 4.1 | Flammable Solid |
| 4.2 | Spontaneously Combustible |
| 4.3 | Dangerous When Wet |
| 5.1 | Oxidizer |
| 5.2 | Organic Peroxide |
| 6.1 (inhalation hazard, Zone A or B) | Poison Inhalation Hazard |
| 6.1 (other than inhalation hazard, Zone A or B) | Poison |
| 6.2 | Infectious substance |
| 7 | Radioactive |
| 8 | Corrosive |
| 9 | Class 9 |

(h) Column 7: Special provisions. Column 7 specifies codes for special provisions applicable to hazardous materials. When Column 7 refers to a special provision for a hazardous material, the meaning and requirements of that special provision are as set forth in § 172.102 of this subpart.

(i) Column 8: Packaging authorizations. Columns 8A, 8B and 8C specify the applicable sections for exceptions, non-bulk packaging requirements and bulk packaging requirements, respectively, in part 173 of this subchapter. Columns 8A, 8B and 8C are completed in a manner which indicates that "§ 173." precedes the designated numerical entry. For example, the entry "202" in Column 8B associated with the proper shipping name "Gasoline" indicates that for this material conformance to non-bulk packaging requirements prescribed in § 173.202 of this subchapter is required. When packaging requirements are specified, they are in addition to the standard requirements for all packagings prescribed in § 173.24 of this subchapter and any other applicable requirements in subparts A and B of part 173 of this subchapter.

(1) Exceptions. Column 8A contains exceptions from some of the requirements of this subchapter. The referenced exceptions are in addition to those specified in subpart A of part 173 and elsewhere in this subchapter. A "None" in this column means no packaging exceptions are authorized, except as may be provided by special provisions in Column 7.

(2) Non-bulk packaging. Column 8B references the section in part 173 of this subchapter which prescribes packaging requirements for non-bulk packagings. A "None" in this column means non-bulk packagings are not authorized, except as may be provided by special provisions in Column 7. Each reference in this column to a material which is a hazardous waste or a hazardous substance, and whose proper shipping name is preceded in Column 1 of the Table by the letter "A" or "W", is modified to include "§ 173.203" or "§ 173.213", as appropriate for liquids and solids, respectively, on those occasions when the material is offered for transportation or transported by a mode in which its transportation is not otherwise subject to the requirements of this subchapter.

(3) Bulk packaging. Column (8C) specifies the section in part 173 of this subchapter that prescribes packaging requirements for bulk packagings, subject to the limitations, requirements, and additional authorizations of Columns (7) and (8B). A "None" in Column (8C) means bulk packagings are not authorized, except as may be provided by special provisions in Column (7) and in packaging authorizations Column (8B). Additional authorizations and limitations for use of UN portable tanks are set forth in Column 7. For each reference in this column to a material that is a hazardous waste or a hazardous substance, and whose proper shipping

name is preceded in Column 1 of the Table by the letter "A" or "W" and that is offered for transportation or transported by a mode in which its transportation is not otherwise subject to the requirements of this subchapter:

(i) The column reference is § 173.240 or § 173.241, as appropriate.

(ii) For a solid material, the exception provided in special provision B54 is applicable.

(iii) For a Class 9 material, which meets the definition of an elevated temperature material, the column reference is § 173.247.

(4) For a hazardous material which is specifically named in the Table and whose packaging sections specify packagings not applicable to the form of the material (e.g., packaging specified is for solid material and the material is being offered for transportation in a liquid form) the following table should be used to determine the appropriate packaging section:

| Packaging section reference for solid materials | Corresponding packaging section for liquid materials |
|---|---|
| § 173.187 | § 173.181 |
| § 173.211 | § 173.201 |
| § 173.212 | § 173.202 |
| § 173.213 | § 173.203 |
| § 173.240 | § 173.241 |
| § 173.242 | § 173.243 |

(5) Cylinders. For cylinders, both non-bulk and bulk packaging authorizations are set forth in Column (8B). Notwithstanding a designation of "None" in Column (8C), a bulk cylinder may be used when specified through the section reference in Column (8B).

(j) Column 9: Quantity limitations. Columns 9A and 9B specify the maximum quantities that may be offered for transportation in one package by passenger-carrying aircraft or passenger-carrying rail car (Column 9A) or by cargo aircraft only (Column 9B), subject to the following:

(1) "Forbidden" means the material may not be offered for transportation or transported in the applicable mode of transport.

(2) The quantity limitation is "net" except where otherwise specified, such as for "Consumer commodity" which specifies "30 kg gross."

(3) When articles or devices are specifically listed by name, the net quantity limitation applies to the entire article or device (less packaging and packaging materials) rather than only to its hazardous components.

(4) A package offered or intended for transportation by aircraft and which is filled with a material forbidden on passenger-carrying aircraft but permitted on cargo aircraft only, or which exceeds the maximum net quantity authorized on passenger-carrying aircraft, shall be labelled with the CARGO AIRCRAFT ONLY label specified in § 172.448 of this part.

(5) The total net quantity of hazardous material for an outer non-bulk packaging that contains more than one hazardous material may not exceed the lowest permitted maximum net quantity per package as shown in Column 9A or 9B, as appropriate. If one material is a liquid and one is a solid, the maximum net quantity must be calculated in kilograms. See § 173.24a(c)(1)(iv).

(k) Column 10: Vessel stowage requirements. Column 10A [Vessel stowage] specifies the authorized stowage locations on board cargo and passenger vessels. Column 10B [Other provisions] specifies codes for stowage and handling requirements for specific hazardous materials. Hazardous materials offered for transportation as limited quantities are allocated stowage category A and are not subject to the stowage codes assigned by column 10B. The meaning of each code in Column 10B is set forth in § 176.84 of this subchapter. Section 176.63 of this subchapter sets forth the physical requirements for each of the authorized locations listed in Column 10A. (For bulk transportation by vessel, see 46 CFR parts 30 to 40, 70, 98, 148, 151, 153 and 154.) The authorized stowage locations specified in Column 10A are defined as follows:

(1) Stowage category "A" means the material may be stowed "on deck" or "under deck" on a cargo vessel or on a passenger vessel.

(2) Stowage category "B" means—

(i) The material may be stowed "on deck" or "under deck" on a cargo vessel and on a passenger vessel carrying a number of passengers limited to not more than the larger of 25 passengers, or one passenger per each 3 m of overall vessel length; and

(ii) "On deck only" on passenger vessels in which the number of passengers specified in paragraph (k)(2)(i) of this section is exceeded.

(3) Stowage category "C" means the material must be stowed "on deck only" on a cargo vessel or on a passenger vessel.

(4) Stowage category "D" means the material must be stowed "on deck only" on a cargo vessel or on a passenger vessel carrying a number of passengers limited to not more than the larger of 25 passengers or one passenger per each 3 m of overall vessel length, but the material is prohibited on a passenger vessel in which the limiting number of passengers is exceeded.

(5) Stowage category "E" means the material may be stowed "on deck" or "under deck" on a cargo vessel or on a passenger vessel carrying a number of passengers limited to not more than the larger of 25 passengers, or one passenger per each 3 m of overall vessel length, but is prohibited from carriage on a passenger vessel in which the limiting number of passengers is exceeded.

(6) Stowage category "01" means the material may be stowed "on deck" in closed cargo transport units or "under deck" on a cargo vessel (up to 12 passengers) or on a passenger vessel.

(7) Stowage category "02" means the material may be stowed "on deck" in closed cargo transport units or "under deck" on a cargo vessel (up to 12 passengers) or "on deck" in closed cargo transport units or "under deck" in closed cargo transport units on a passenger vessel.

(8) Stowage category "03" means the material may be stowed "on deck" in closed cargo transport units or "under deck" on a cargo vessel (up to 12 passengers) but the material is prohibited on a passenger vessel.

(9) Stowage category "04" means the material may be stowed "on deck" in closed cargo transport units or "under deck" in closed cargo transports on a cargo vessel (up to 12 passengers) but the material is prohibited on a passenger vessel.

(10) Stowage category "05" means the material may be stowed "on deck" in closed cargo transport units on a cargo vessel (up to 12 passengers) but the material is prohibited on a passenger vessel.

(*l*) Changes to the Table.

(1) Unless specifically stated otherwise in a rule document published in the Federal Register amending the Table—

(i) Such a change does not apply to the shipment of any package filled prior to the effective date of the amendment; and

(ii) Stocks of preprinted shipping papers and package markings may be continued in use, in the manner previously authorized, until depleted or for a one-year period, subsequent to the effective date of the amendment, whichever is less.

(2) Except as otherwise provided in this section, any alteration of a shipping description or associated entry which is listed in the § 172.101 Table must receive prior written approval from the Associate Administrator.

(3) The proper shipping name of a hazardous material changed in the May 6, 1997 final rule, in effect on October 1, 1997, only by the addition or omission of the word "compressed," "inhibited," "liquefied" or "solution" may continue to be used to comply with package marking requirements, until January 1, 2003.

| Symbols (1) | Hazardous materials descriptions and proper shipping names (2) | Hazard class or Division (3) | Identification Numbers (4) | PG (5) | Label Codes (6) | Special provisions (§172.102) (7) | Packaging (§173.***) | | | Quantity limitations (see §§173.27 and 175.75) | | Vessel stowage | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Exceptions (8A) | Non-bulk (8B) | Bulk (8C) | Passenger aircraft/rail (9A) | Cargo aircraft only (9B) | Location (10A) | Other (10B) |
| G | Oxidizing solid, flammable, n.o.s | 5.1 | UN3137 | I | 5.1, 4.1 | 62 | None | 214 | 214 | Forbidden | Forbidden | – | 13, 147, 148 |
| G | Oxidizing solid, n.o.s. | 5.1 | UN1479 | I | 5.1 | 62, IB5, IP1 | None | 211 | 242 | 1 kg | 15 kg | D | 56, 58, 138 |
| | | | | II | 5.1 | 62, IB8, IP2, IP4, T3, TP33 | 152 | 212 | 240 | 5 kg | 25 kg | B | 56, 58, 106, 138 |
| | | | | III | 5.1 | 62, 148, IB8, IP3, T1, TP33 | 152 | 213 | 240 | 25 kg | 100 kg | B | 56, 58, 106, 138 |
| G | Oxidizing solid, self-heating, n.o.s. | 5.1 | UN3100 | I | 5.1, 4.2 | 62 | None | 214 | 214 | Forbidden | Forbidden | | 56, 58, 138 |
| G | Oxidizing solid, toxic, n.o.s. | 5.1 | UN3087 | I | 5.1, 6.1 | 62 | None | 211 | 242 | 1 kg | 15 kg | D | 56, 58, 138 |
| | | | | II | 5.1, 6.1 | 62, IB6, IP2, T3, TP33 | 152 | 212 | 242 | 5 kg | 25 kg | B | 56, 58, 138 |
| | | | | III | 5.1, 6.1 | 62, IB8, IP3, T1, TP33 | 152 | 213 | 240 | 25 kg | 100 kg | B | 56, 58, 138 |
| G | Oxidizing solid, water reactive, n.o.s | 5.1 | UN3121 | I | 5.1, 4.3 | 62 | None | 214 | 214 | Forbidden | Forbidden | | 13, 148 |
| | Oxygen, compressed | 2.2 | UN1072 | | 2.2, 5.1 | 110, A14 | 306 | 302 | 314, 315 | 75 kg | 150 kg | A | 13, 148 |
| | Oxygen difluoride, compressed | 2.3 | UN2190 | | 2.3, 5.1 | 1, N86 | None | 304 | None | Forbidden | Forbidden | D | 13, 40, 89, 90 |
| | Oxygen generator, chemical (including oxygen generators, chemical, contained in associated equipment, e.g., passenger service units (PSUs), portable breathing equipment (PBE), etc) | 5.1 | UN3356 | | 5.1, 8 | ................ | None | 168 | None | Forbidden | 25 kg | D | 56, 58, 69, 106 |
| + | Oxygen generator, chemical, spent | 9 | NA3356 | | 9, | 61 | None | 213 | None | Forbidden | Forbidden | A | |
| | Oxygen, refrigerated liquid (cryogenic liquid) | 2.2 | UN1073 | | 2.2 | | 320 | 316 | 318 | Forbidden | Forbidden | D | |
| | Paint (including paint, lacquer, enamel, stain, shellac solutions, varnish, polish, liquid filler and liquid lacquer base) | 3 | UN1263 | I | 3 | 367, T11, TP1, TP8, TP27 | 150 | 201 | 243 | 1 L | 30 L | E | |
| | | | | II | 3 | 149, 367, 383, B52, B131, IB2, T4, TP1, TP8, TP28 | 150 | 173 | 242 | 5 L | 60 L | B | |
| | | | | III | 3 | 367, B1, B52, B131, IB3, T2, TP1, TP29 | 150 | 173 | 242 | 60 L | 220 L | A | |
| | Paint or Paint related material | 8 | UN3066 | II | 8 | 367, B2, IB2, T7, TP2, TP28 | 154 | 173 | 242 | 1 L | 30 L | A | 40 |

**49 C.F.R. § 173.24.  General requirements for packagings and packages.**

(a) Applicability. Except as otherwise provided in this subchapter, the provisions of this section apply to—

(1) Bulk and non-bulk packagings;

(2) New packagings and packagings which are reused; and

(3) Specification and non-specification packagings.

(b) Each package used for the shipment of hazardous materials under this subchapter shall be designed, constructed, maintained, filled, its contents so limited, and closed, so that under conditions normally incident to transportation—

(1) Except as otherwise provided in this subchapter, there will be no identifiable (without the use of instruments) release of hazardous materials to the environment;

(2) The effectiveness of the package will not be substantially reduced; for example, impact resistance, strength, packaging compatibility, etc. must be maintained for the minimum and maximum temperatures, changes in humidity and pressure, and shocks, loadings and vibrations, normally encountered during transportation;

(3) There will be no mixture of gases or vapors in the package which could, through any credible spontaneous increase of heat or pressure, significantly reduce the effectiveness of the packaging;

(4) There will be no hazardous material residue adhering to the outside of the package during transport.

\* \* \*

**49 C.F.R. § 173.27.  General requirements for transportation by aircraft**

(a) The requirements of this section are in addition to requirements prescribed elsewhere under this part and apply to packages offered or intended for transportation aboard aircraft. Except for materials not subject to performance packaging requirements in subpart E of this part, a

packaging containing a Packing Group III material with a primary or subsidiary risk of Division 4.1, 4.2, 4.3, 5.1, or Class 8 must meet the Packing Group II performance level when offered for transportation by aircraft.

(b) Packages authorized onboard aircraft.

(1) When Column 9a of the § 172.101 table indicates that a material is "Forbidden", that material may not be offered for transportation or transported aboard passenger-carrying aircraft.

(2) When Column 9b of the § 172.101 table indicates that a material is "Forbidden", that material may not be offered for transportation or transported aboard aircraft.

(3) The maximum quantity of hazardous material in a package that may be offered for transportation or transported aboard a passenger-carrying aircraft or cargo aircraft may not exceed that quantity prescribed for the material in Column 9a or 9b, respectively, of the § 172.101 table.

(4) A package containing a hazardous material which is authorized aboard cargo aircraft but not aboard passenger aircraft must be labeled with the CARGO AIRCRAFT ONLY label required by § 172.402(c) of this subchapter and may not be offered for transportation or transported aboard passenger-carrying aircraft.

(c) Pressure requirements.

(1) Packagings must be designed and constructed to prevent leakage that may be caused by changes in altitude and temperature during transportation aboard aircraft.

(2) Except for packagings used for material transported as "UN3082, Environmentally hazardous substance, liquid, n.o.s.," packagings for which retention of liquid is a basic function must be capable of withstanding without leakage the greater of—

(i) An internal pressure which produces a gauge pressure of not less than 75 kPa (11 psig) for liquids in Packing Group III of Class 3 or Division 6.1; or 95 kPa (14 psig) for other liquids; or

(ii) A pressure related to the vapor pressure of the liquid to be conveyed, determined by one of the following:

(A) The total gauge pressure measured in the receptacle (i.e., the vapor pressure of the material and the partial pressure of air or other inert gases, less 100 kPa (15 psia)) at 55 °C (131 °F), multiplied by a safety factor of 1.5; determined on the basis of a filling temperature of 15 °C (59 °F) and a degree of filling such that the receptacle is not completely liquid full at a temperature of 55 °C (131 °F) or less;

(B) 1.75 times the vapor pressure at 50 °C (122 °F) less 100 kPa (15 psia); or

(C) 1.5 times the vapor pressure at 55 °C (131 °F) less 100 kPa (15 psia).

(3) Notwithstanding the provisions of paragraph (c)(2) of this section—

(i) Hazardous materials may be contained in an inner packaging which does not itself meet the pressure requirement provided that the inner packaging is packed within a supplementary packaging which does meet the pressure requirement and other applicable packaging requirements of this subchapter.

(ii) Packagings which are subject to the hydrostatic pressure test and marking requirements of §§ 178.605 and 178.503(a)(5), respectively, of this subchapter must have a marked test pressure of not less than 250 kPa (36 psig) for liquids in Packing Group I, 80 kPa (12 psig) for liquids in Packing Group III of Class 3 or Division 6.1, and 100 kPa (15 psig) for other liquids.

(d) Closures. The body and closure of any packaging must be constructed to be able to adequately resist the effects of temperature and vibration occurring in conditions normally incident to air transportation. Inner packaging or receptacle closures of combination packages containing liquids must be held securely, tightly and effectively in place by secondary means. Examples of such secondary methods include: Adhesive tape, friction sleeves, welding or soldering, locking wires, locking rings, induction heat seals, and child-resistant closures. The closure device must be designed so that it is unlikely that it can be incorrectly or incompletely closed. Closures must be as follows:

(1) Packing Group I. An inner packaging containing liquids of Packing Group I must have a secondary means of closure applied and packed in accordance with paragraph (e) of this section.

(2) Packing Groups II and III. When a secondary means of closure cannot be applied or is impracticable to apply to an inner packaging containing liquids of Packing Groups II and III, this requirement may be satisfied by securely closing the inner packaging and placing it in a leakproof liner or bag before placing the inner packaging in its outer packaging.