**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2376
_____

AXALTA COATING SYSTEMS LLC,
Petitioner

v.

FEDERAL AVIATION ADMINISTRATION

_____

On Petition for Review of a Decision and Order of the
Administrator of the Federal Aviation Administration
(Dkt. No. FAA-2020-0958)
_____

Argued:  February 20, 2025
_____

Before:  CHAGARES, <u>Chief</u> <u>Judge</u>, BIBAS and FISHER,
<u>Circuit</u> <u>Judges</u>

(Opinion filed:  July 15, 2025)

Jerry W. Cox, Esq. **[ARGUED]**
14561 Sterling Oak Drive
Naples, FL 34110

<u>Counsel for Petitioner</u>

Kara M. Rollins, Esq.
New Civil Liberties Alliance
4250 N Fairfax Drive
Suite 300
Arlington, VA 22203

<u>Counsel for Amicus Curiae New Civil Liberties Alliance</u>

Daniel J. Aguilar, Esq. **[ARGUED]**
United States Department of Justice, Civil Division
Room 7266
950 Pennsylvania Avenue NW
Washington, DC 20530

Taneesha D. Marshall, Esq.
Federal Aviation Administration
Office of the Regional Administrator
1701 Columbia Avenue
College Park, GA 30337

_____

OPINION OF THE COURT

_____

CHAGARES, <u>Chief</u> <u>Judge</u>.

Axalta Coating Systems LLC ("Axalta"), a paint supplier, provided a can of flammable paint to FedEx for shipment by air. The paint spilled during shipment when the lid to the can came loose. The Federal Aviation Administration ("FAA") filed an administrative complaint alleging that Axalta failed to package the paint as required by the Hazardous Materials Regulations ("HMR"), 49 C.F.R. § 171 <u>et</u> <u>seq.</u> After a hearing, an Administrative Law Judge ("ALJ") concluded that Axalta violated the HMR and assessed a civil penalty of $1,900. The Administrator of the FAA affirmed the ALJ's penalty assessment. Axalta now petitions us to vacate the Administrator's order, arguing, <u>inter</u> <u>alia</u>, that the administrative adjudication of the FAA's complaint contravened the Seventh Amendment's jury trial guarantee, as the Supreme Court recently interpreted it in <u>SEC v. Jarkesy</u>, 603 U.S. 109 (2024). Because the administrative adjudication did not violate the Seventh Amendment, and Axalta has not otherwise identified any viable basis for relief, we will deny Axalta's petition.

I.

Axalta delivered a four-liter metal can of paint to FedEx for shipment by air on January 10, 2017. Axalta packaged the paint in a metal can fitted with a "friction lid . . . secured by metal retaining clips." Joint Appendix ("J.A.") 131. It then

covered the can with a plastic bag and placed it in a fiberboard box. FedEx transported the package by cargo airplane to a sorting center, where a FedEx employee discovered that it was leaking paint. Michael Hoysler, a Senior Safety Specialist employed by FedEx, inspected the package and prepared a "Hazardous Materials Incident Report" for submission to the Department of Transportation. J.A. 139; see also id. 139–43. Hoysler stated in the report that the can was not fitted with "the ring lock required for air shipments" and opined that the spill occurred because "[p]ressure in the aircraft forced the lid off the can." J.A. 142.

Counsel for the FAA filed an administrative complaint[1] alleging that Axalta failed to package the paint in a manner consistent with three provisions of the HMR: (1) 49 C.F.R. § 171.2(e), which requires a party offering a package for shipping to comply with the HMR; (2) 49 C.F.R. § 173.24(b), which requires a party offering a package for shipping to use packaging that withstands "conditions normally incident to transportation"; and (3) 49 C.F.R. § 173.173(b), which specifies acceptable combinations of packaging materials. Axalta moved to dismiss the complaint, arguing, inter alia, that the FAA failed to allege that Axalta acted with the requisite scienter. The ALJ denied the motion. Axalta then filed a

---

[1] Under 14 C.F.R. § 13.16(f)–(g), a party served by the FAA with notice of a proposed civil penalty may request an administrative hearing. Counsel for the FAA must file a complaint on the FAA hearing docket within 20 days of receiving the respondent's request for a hearing. Id. § 13.208(a). Axalta filed a request for hearing on March 3, 2021, and counsel for the FAA timely filed an administrative complaint on March 9, 2021.

motion to disqualify the ALJ on the grounds that his appointment violated the Appointments Clause of the Constitution and that he was unconstitutionally protected from presidential removal. The ALJ also denied this motion.

The parties proceeded to a hearing, which took place on September 20, 2022. The FAA offered the testimony of a single witness, Wayne Knight, an FAA investigator. It also introduced into evidence the Hazardous Materials Incident Report prepared by Hoysler, the FedEx employee who investigated the spill. The ALJ issued an Initial Decision on October 17, 2022. He concluded that Axalta violated 49 C.F.R. § 171.2(e) and 49 C.F.R. § 173.24(b)(1) and assessed a penalty of $1,900. Axalta filed an administrative appeal pursuant to 14 C.F.R. § 13.233(a). The FAA filed a cross-appeal seeking revision of the penalty amount to $9,500. The Administrator affirmed the ALJ's disposition by a Decision and Order entered on June 7, 2023. Axalta timely petitioned this court for review of the Administrator's order.

## II.

We have jurisdiction to review the Administrator's order pursuant to 49 U.S.C. § 5127. The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., supplies the standards that govern our review. The APA provides, in particular, that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions" if they are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right . . . (C) in excess of statutory jurisdiction . . . (D) without observance of procedure required by law . . . (E) unsupported by substantial evidence . . . or (F) unwarranted by the facts to

the extent that the facts are subject to trial de novo by the reviewing court." Id. § 706.

Our review of whether an agency action is in accordance with federal statute and the Constitution is de novo. See Loper Bright Enters. v. Raimondo, 603 U.S. 369, 392 (2024) ("Under the APA, it . . . 'remains the responsibility of the court to decide whether the law means what the agency says.'" (quoting Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in the judgment))). But we must accept an agency's factual findings as conclusive "if they are 'supported by substantial evidence given the record as a whole.'" Crozer-Chester Med. Ctr. v. NLRB, 976 F.3d 276, 283–84 (3d Cir. 2020) (quoting Hertz Corp. v. NLRB, 105 F.3d 868, 872 (3d Cir. 1997)). Substantial evidence is "more than a mere scintilla," id. at 284 (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)), and must be such that "a reasonable mind might accept [it] as adequate to support a conclusion," Lusingo v. Gonzales, 420 F.3d 193, 199 (3d Cir. 2005) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939)).

## III.

Axalta's principal argument is that the Seventh Amendment, as the Supreme Court interpreted it in Jarkesy, prohibits the adjudication of the FAA's action for civil penalties in an administrative forum in which no jury is available. The enforcement action at issue here, Axalta suggests, is in all relevant respects the same as the enforcement action at issue in Jarkesy. We are unpersuaded, however, that the enforcement action before us is meaningfully analogous to the enforcement action considered by the Court in Jarkesy. We

therefore see no basis on which to conclude that Axalta is entitled to relief from the Administrator's order under the Seventh Amendment.

The Seventh Amendment provides that "[i]n Suits at common law . . . the right of trial by jury shall be preserved." U.S. Const. amend. VII.  In <u>Jarkesy</u>, the Court addressed "a straightforward question: whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud." 603 U.S. at 120. Jarkesy, the defendant, was an investment fund manager alleged by the Securities and Exchange Commission ("SEC" or "Commission") to have violated several statutory prohibitions against securities fraud.  <u>Id.</u> at 118–19.  After proceedings on these charges before an ALJ employed by the Commission, the SEC imposed a civil penalty of $300,000. <u>Id.</u> at 119.  Jarkesy petitioned the courts for relief from the Commission's order, arguing that the adjudication of the SEC's enforcement action in a jury-less administrative forum deprived him of his right under the Seventh Amendment to a trial by jury.  <u>Id.</u>

The Court addressed Jarkesy's claim by conducting a two-part analysis.  <u>See id.</u> at 119–20.  It first considered the "threshold issue" of "whether th[e] action implicates the Seventh Amendment."  <u>Id.</u> at 120.  The Court answered this "threshold" question in the affirmative because the "SEC's antifraud provisions replicate[d] common law fraud," <u>id.</u>, and because the SEC had sought "civil penalties," a "prototypical common law remedy," <u>id.</u> at 123.  The Court then "consider[ed] whether the 'public rights' exception . . . applie[d]." <u>Id.</u> at 120.  As the Court explained, under the public rights exception, Congress may in some circumstances "assign

[a] matter for decision to an agency without a jury," even when the matter implicates the Seventh Amendment. Id. at 127.

The Court acknowledged the tendency of the public rights jurisprudence to produce "arcane distinctions and confusing precedents," id. at 130 (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 583 (1985)), but resolved the public rights question in Jarkesy in a notably uncomplicated way:  by analogizing the SEC's enforcement action to the action at issue in one public rights precedent — Granfinanciera, S.A. v. Nordberg, 492 U.S. 33 (1989) — and distinguishing it from the enforcement action at issue in another — Atlas Roofing Co. v. Occupational Safety & Health Review Commission, 430 U.S. 442 (1977).  In Granfinanciera, the Court held that Congress could not, consistent with the Seventh Amendment, assign the adjudication of a fraudulent conveyance action brought by the trustee of a bankruptcy estate to a bankruptcy court, a non-Article III forum where trial by jury was unavailable.  492 U.S. at 36.  "The decisive point" for the Court in Granfinanciera was that, by authorizing bankruptcy judges to adjudicate fraudulent conveyance actions, Congress did not "creat[e] a new cause of action . . . unknown to the common law," id. at 60 (alteration in original) (quoting Atlas Roofing, 430 U.S. at 461), but "simply reclassified a pre-existing, common-law cause of action that was not integrally related to the reformation of debtor-creditor relations," id.  Such a "purely taxonomic change" could not make a private right public.  Id. at 61.  "Congress cannot eliminate a party's Seventh Amendment right to a jury trial," the Court emphasized, "merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency."  Id.

The Court in Jarkesy considered Granfinanciera dispositive of its public rights analysis.  603 U.S. at 134 (determining that "*Granfinanciera* effectively decides th[e] case").  Like the fraudulent conveyance action considered in Granfinanciera, the Court explained, the statutory fraud provisions at issue in Jarkesy "target[ed] the same basic conduct as" a longstanding common law counterpart — common law fraud — "employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles."  Id.  Because the statutory fraud provisions the SEC sought to enforce against Jarkesy were in essence creatures of the common law, the Court reasoned, the public rights doctrine was inapplicable, and the Seventh Amendment required that any action arising under those provisions be tried before a jury.  See id.

The Court in Jarkesy distinguished another public rights precedent, Atlas Roofing, in which it had held that the Seventh Amendment did not prohibit the administrative adjudication of a civil penalty action for alleged violations of the Occupational Safety and Health Act of 1970 ("OSH Act").  See Atlas Roofing, 430 U.S. at 461.  In Atlas Roofing, the Occupational Safety and Health Review Commission imposed civil penalties on two employers after determining that they had violated safety regulations promulgated by the Secretary of Labor under the authority of the OSH Act.  Id. at 447–48.  The employers sought relief from the penalties in federal court, arguing that the administrative adjudication of their alleged violations contravened the Seventh Amendment.  Id. at 448.  The Supreme Court disagreed.  The safety standards created by the OSH Act and related regulations, the Court determined, were "unknown to the common law."  Id. at 461.  The Court therefore concluded that the standards were "new statutory 'public rights'" that Congress could "assign [for] adjudication

to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's" jury trial guarantee.  Id. at 455.

In Jarkesy, the Court explained that the provisions of the OSH Act were meaningfully distinct from the fraudulent conveyance cause of action at issue in Granfinanciera and the statutory fraud provisions at issue in Jarkesy because, unlike the statutes in those cases, "the OSH Act did not borrow its cause of action from the common law."  Jarkesy, 603 U.S. at 136.  The safety standards established by the OSH Act and related regulations brought "no common law soil with them."  Id. at 137.  They did not "reiterate common law terms of art," the Court observed, but "instead resembled a detailed building code."  Id.  The Court further explained that Congress's purpose in enacting the OSH Act "was not to enable the Federal Government to bring or adjudicate claims [in an administrative forum] that traced their ancestry to the common law."  Id.  Rather, "[i]n both concept and execution, the Act was self-consciously novel."  Id.  The Court found these attributes of a public right missing from the statutory fraud action against Jarkesy, which was "'in the nature of' a common law suit."  Id. at 138 (quoting Atlas Roofing, 430 U.S. at 453) (quotation marks omitted).  The Court therefore concluded that its holding in Atlas Roofing "d[id] not control" its analysis of the SEC's enforcement action against Jarkesy.  Id.

We draw several conclusions from the Court's opinion in Jarkesy.  First, the Court in Jarkesy applied, but did not abrogate, the public rights doctrine.  Second, the Court distinguished, but did not overrule, its holding in Atlas Roofing.  And, third, the Court's opinion in Jarkesy confirmed that a claim under the Seventh Amendment for relief from an

administrative adjudication is subject to a two-part analysis. A court first considers the "threshold" question whether the "action implicates the Seventh Amendment" because of its common law ancestry or the common-law nature of the remedy sought. Id. at 120. But even if a "case does implicate the Seventh Amendment," the court must "next consider whether the 'public rights' exception" applies. Id. This inquiry, the Court in Jarkesy suggested, is a matter of ascertaining whether an action more closely resembles the essentially common law action in Granfinanciera, in which case the public rights doctrine does not apply, or, instead, the action in Atlas Roofing, in which case an administrative adjudication does not violate the Seventh Amendment. See id. at 132–40.

The FAA acknowledges that a civil monetary penalty such as that imposed on Axalta is a "prototypical common law remedy." FAA Br. 19 (quoting Jarkesy, 603 U.S. at 123). The FAA therefore concedes, with respect to the first part of the analysis from Granfinanciera and Jarkesy, that the Administrator's order "implicates the Seventh Amendment." Id. (quoting Jarkesy, 603 U.S. at 120). Given this concession, we confine our inquiry to the second part of the Jarkesy analysis: whether the public rights doctrine justifies the administrative adjudication of the FAA's enforcement action.[2]

---

[2] Axalta identifies the Supreme Court's opinion in Tull v. United States, 481 U.S. 412 (1987), as support for its position. In Tull, the Supreme Court held that the Seventh Amendment guaranteed a jury trial to the respondent in an action by the government seeking, in district court, a civil penalty for an alleged violation of the Clean Water Act, 33 U.S.C. § 1251, et seq. Tull, 481 U.S. at 414, 427. Because the action in Tull occurred in district court, the public rights

See Jarkesy, 603 U.S. at 120.  Because we are persuaded that the FAA's enforcement action cannot be distinguished from the enforcement action considered in Atlas Roofing, we are constrained to answer this question affirmatively.

The FAA's authority to seek a civil penalty for a violation of the HMR arises under 49 U.S.C. § 5123(a)(1), which provides that a "person that knowingly violates this chapter [Chapter 51 of Title 49 to the United States Code] or a regulation, order, special permit, or approval issued under this chapter is liable to the United States Government for a civil penalty of not more than $75,000 for each violation."  Under this provision, "[a] person acts knowingly when . . . the person has actual knowledge of the facts giving rise to the violation; or . . . a reasonable person acting in the circumstances and exercising reasonable care would have that knowledge."  Id.  A separate provision specifies that the Secretary may find a violation and impose a civil penalty through administrative process.  See id. § 5123(b) (providing that the Secretary "may find that a person has violated" the HMR "after notice and an opportunity for a hearing," and shall thereafter "impose a penalty . . . by giving the person written notice of the amount of the penalty").

The Secretary of Transportation promulgates the HMR pursuant to 49 U.S.C. § 5103(b), which provides, in part, that

_____

doctrine was not at issue.  So although the opinion in Tull is relevant to the "threshold" question of whether a civil penalty "implicates the Seventh Amendment" — a question not in dispute, given the FAA's concession that the remedy sought is legal in nature — the opinion is not relevant to our assessment of the public rights doctrine.  Jarkesy, 603 U.S. at 120.

the "Secretary shall prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce."  As previously noted, the Administrator determined that Axalta violated two provisions of the HMR:  49 C.F.R. § 171.2(e), which prohibits a person from "offer[ing] or accept[ing] a hazardous material for transportation in commerce unless" it is packaged consistent with the provisions of the HMR, and 49 C.F.R. § 173.24(b), which requires that "[e]ach package used for the shipment of hazardous materials . . . be designed, constructed, maintained, filled, its contents so limited, and closed, so that under conditions normally incident to transportation . . . there will be no identifiable . . . release of hazardous materials to the environment."  The Administrator concluded that Axalta violated the general mandate of compliance codified at 49 C.F.R. § 171.2(e) insofar as it failed to comply with 49 C.F.R. § 173.27(d), which provides, in part, that "[t]he body and closure of any packaging must be constructed to be able to adequately resist the effects of temperature and vibration occurring in conditions normally incident to air transportation."

We do not consider the "standards" established by the HMR to "bring . . . common law soil with them."  Jarkesy, 603 U.S. at 137.  Instead, like the regulations at issue in Atlas Roofing, they consist of technical prescriptions for engaging in the regulated activity.  One of the HMR provisions Axalta was found to have violated — 49 C.F.R. § 173.27(d), as incorporated by 49 C.F.R. § 171.2(e) — requires that "[i]nner packaging or receptacle closures of combination packages containing liquids . . . be held securely, tightly and effectively in place by secondary means," such as "[a]dhesive tape,

friction sleeves, welding or soldering, locking wires, locking rings, induction heat seals, and child-resistant closures."

The other provision Axalta was found to have violated, although uncomplicated on its face, establishes even more technical compliance standards. See id. § 173.24(b). As noted, this provision requires that "[e]ach package used for the shipment of hazardous materials" be constructed and closed so that no leakage occurs during "conditions normally incident to transportation." Id. The HMR elsewhere provide the technical parameters of conditions considered normal in various modes of transportation. See, e.g., id. § 173.27(c). So, for example, the provision governing the transportation of hazardous materials by aircraft specifies that

> packagings for which retention of liquid is a basic function must be capable of withstanding without leakage the greater of . . . [a]n internal pressure which produces a gauge pressure of not less than 75kPa (11 psig) for liquids in Packing Group III of Class 3 or Division 6.1; or 95 kPa (14 psig) for other liquids; or . . . [a] pressure related to the vapor pressure of the liquid to be conveyed, determined by one of [three specified methods].

Id. § 173.27(c)(2). Technical standards such as these are "unknown to the common law." Jarkesy, 603 U.S. at 137 (quoting Atlas Roofing, 430 U.S. at 461). The controlling precedent is therefore Atlas Roofing, not Granfinanciera.

Axalta and its supporting amicus curiae the New Civil Liberties Alliance attempt to avoid this conclusion by

suggesting that the common law terms found in one of two definitions of "knowingly" provided at 49 U.S.C. § 5123(a)(1)(B) mean that any action to enforce the HMR is, in essence, a common law negligence action. We are unpersuaded. These common law terms — "reasonable person" and "reasonable care" — do not define the circumstances under which a person "violates" the HMR. See 49 U.S.C. § 5123(a)(1)(B). They tell us, instead, when a person "knowing[ly]" violates the HMR's standards of conduct — standards that descend in no way from the common law. Cf. Jarkesy, 603 U.S. at 134 (noting that the statutory fraud prohibition and common law fraud "target the same basic conduct"). So, for example, we may determine, without any resort to common law concepts, that a person who offers a package for shipment by air that cannot withstand the pressures specified at 49 C.F.R. § 173.27(c)(2) has "violated" the HMR. The common law terms at 49 U.S.C. § 5123(a)(1)(B) are relevant only to the question whether the violating party knew of the violation. It remains that the HMR's technical "standards bring no common law soil with them" — even if Congress necessarily drew upon the common law when defining the circumstances under which a person has knowledge that he violated these standards. Jarkesy, 603 U.S. at 137.

In sum, the FAA's right to enforce the HMR is closely analogous to the right considered by the Court in Atlas Roofing. And it is markedly different from the fraud cause of action considered in Granfinanciera and Jarkesy. Reasoning by analogy compels us to conclude that FAA's right to enforce the HMR by obtaining a civil monetary penalty against a violator is a public right that Congress may assign to the

executive branch for adjudication without offense to the Seventh Amendment.[3]

## IV.

Axalta argues that it is entitled to relief on six additional grounds. It argues that (1) the FAA's decision to pursue the enforcement action in an administrative rather than judicial forum was an unconstitutional exercise of the legislative power by the executive branch; (2) the ALJ's appointment is unconstitutional because it was not sufficiently publicized; (3) the ALJ's appointment is unconstitutional because the ALJ enjoys multiple levels of for-cause removal protection; (4) the applicable statute of limitations bars the FAA's action against Axalta; (5) the Administrator failed to give effect to the scienter requirement established by the relevant statute; and (6) the Administrator erred by finding Axalta liable for a regulatory violation not charged by the FAA. We address each argument in turn and conclude that none provides a viable basis for relief.

---

[3] Axalta separately argues that the administrative adjudication was inconsistent with the vesting clause of Article III of the Constitution insofar as it was an exercise of the judicial power by the executive branch. But because matters involving public rights may be assigned to the executive branch for adjudication without offense to Article III, our conclusion that the FAA's enforcement action is within the scope of the public rights doctrine necessarily resolves Axalta's argument that the adjudication violated Article III. See Granfinanciera, 492 U.S. at 53–54.

A.

Axalta argues that Congress improperly delegated its legislative power to the FAA by allowing the Administrator, in an unlimited exercise of his discretion, to bring an enforcement action either in federal court or in an administrative forum. The FAA responds that we cannot consider the argument because Axalta failed to present it at any point in the administrative proceedings. Our review of the administrative record confirms that Axalta never presented the argument during the administrative proceedings. As a result, neither the ALJ in the first instance, nor the Administrator on appeal, had occasion to consider the nondelegation question.

The applicable rule of issue preservation is supplied by statute. Section 5127(d) of Title 49 of the United States Code provides that, "[i]n reviewing a final action under this section, the court may consider an objection to a final action of the Secretary only if the objection was made in the course of a proceeding . . . or if there was a reasonable ground for not making the objection in the proceeding." Axalta suggests that there was a reasonable ground for not making the nondelegation argument because presenting the argument to the ALJ or the Administrator "would have been futile." Reply Br. 15. In particular, Axalta observes that the Administrator declined to consider its Appointments Clause and Seventh Amendment objections on the basis that the Administrator was not competent to review the constitutionality of an act of Congress. The Administrator did, however, consider Axalta's arguments that the ALJ's appointment was not accompanied by sufficient ceremony and that the administrative adjudication deprived Axalta of due process. The Administrator reasoned that these constitutional arguments were susceptible of

administrative determination because they concerned acts of the agency, not Congress.

We assume without deciding that the Administrator would have declined to entertain Axalta's nondelegation argument and, therefore, that there was a reasonable ground for not presenting this argument during the administrative proceeding. We nevertheless conclude that Axalta's nondelegation argument is without merit. The only authority Axalta cites in support of its theory is an opinion issued by a divided panel of the Court of Appeals for the Fifth Circuit in Jarkesy v. SEC, 34 F.4th 446, 461 (5th Cir. 2022), aff'd on other grounds, 603 U.S. 109 (2024). We decline, however, to adopt the panel majority's theory as our own. The panel majority in Jarkesy asserted "that the power to assign disputes to agency adjudication is 'peculiarly within the authority of the legislative department.'" Id. (quoting Oceanic Steam Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909)). The panel majority appeared to reason that if the power to assign agency adjudication were peculiarly — that is, exclusively — within the authority of Congress, then Congress could not authorize the executive to choose in which forum to bring an action. See id. In fact, however, the Court in Oceanic Steam did not describe "the power to assign disputes to agency adjudication" as "peculiarly within the authority of the legislative department." Id. (quoting Oceanic Steam, 214 U.S. at 339). As the sentence preceding that quoted by the panel majority makes clear, the Court in Oceanic Steam indicated, instead, that matters relating "to tariff, . . . internal revenue, [and] taxation" were "subjects peculiarly within the authority of the legislative department." Id.

To the extent that there is authority directly addressing the permissible extent of the executive's discretion when enforcing the law, it speaks against Axalta's nondelegation theory.  In United States v. Batchelder, 442 U.S. 114 (1979), the Supreme Court held that Congress, by enacting two criminal statutes with identical elements but different penalties, had not impermissibly delegated to the executive the legislative prerogative of defining criminal penalties.  Id. at 125–26.  A prosecutor's discretion to choose which offense to charge, and therefore what penalty to seek, was, the Court explained, "no broader than the authority [a prosecutor] routinely exercise[s] in enforcing the criminal laws."  Id. at 126.  The Supreme Court has recognized that an agency's discretion in deciding the manner of enforcing the laws is comparable to that exercised by a prosecutor.  See SEC v. Chenery Corp., 332 U.S. 194, 203 (1947) (observing that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency").  In our view, the FAA's discretion to choose the forum in which to pursue the civil penalty action against Axalta is, like a prosecutor's charging discretion, an incident of executive rather than legislative power.

We have recognized that "the non-delegation doctrine applies only to delegations by Congress of legislative power" but "has no application to exercises of executive power." United States v. Bruce, 950 F.3d 173, 175 (3d Cir. 2020). Because the choice of where to bring an enforcement action is part of the executive rather than legislative power, Congress may leave this choice to agencies without offense to the nondelegation doctrine.

B.

Axalta argues that the administrative adjudication was constitutionally defective in another respect:  the ALJ, Axalta contends, was protected by two levels of for-cause removal protection, an arrangement that the Supreme Court has recognized as an unconstitutional impairment of the President's power to execute the law.[4]  See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 492 (2010).  The FAA does not defend the constitutionality of the ALJ's removal protections.  It argues, nevertheless, that Axalta is not entitled to relief because it failed to allege or demonstrate that the allegedly unconstitutional removal restriction caused Axalta compensable harm.

We agree with the FAA.  In Collins v. Yellen, 594 U.S. 220 (2021), the Supreme Court concluded that the Director of the Federal Housing Finance Agency was unconstitutionally protected from removal by the President, but held that this constitutional defect did not deprive the Director of authority to act.  Id. at 257–59.  The mere fact of being subject to the Director's authority, the Court explained, was not a compensable harm warranting relief.  Id. at 258–60.  Instead, as we have explained when discussing Collins, "a challenger [to an allegedly unconstitutional removal protection] must show that the constitutional infirmity actually caused harm."

---

[4] Under 5 U.S.C. § 7521(a), "[a]n action [such as removal] may be taken against an [ALJ] . . . only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board."

NLRB v. Starbucks Corp., 125 F.4th 78, 88 (3d Cir. 2024). The only harm that Axalta asserts is the fact of having been made to appear before an ALJ who benefited from allegedly unconstitutional removal protections. Under Collins and Starbucks, this asserted harm cannot provide a basis for granting relief to Axalta. We therefore decline to disturb the Administrator's order based on the alleged unconstitutionality of the ALJ's protections from removal.[5]

## C.

Axalta's three remaining arguments for relief are also without merit. Axalta first asserts that the Administrator's penalty assessment was untimely under 28 U.S.C. § 2462, which provides in relevant part that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued." The spill occurred on January 10, 2017, the FAA commenced an administrative proceeding against Axalta by filing an

---

[5] Axalta's separate argument that the Appointments Clause requires ALJs to be appointed in a public ceremony with some unspecified degree of formality is unsupported by any relevant authority and, we conclude, without merit. The Appointments Clause requires that officers like ALJs be appointed by the President, unless (as relevant here) "Congress . . . vest[s] the[ir] Appointment . . . in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Here, that textual requirement was satisfied: Congress vested the appointment of the Department of Transportation's ALJs in the Secretary of Transportation, who duly appointed the ALJ who adjudicated this action. 5 U.S.C. § 3105.

administrative complaint on March 9, 2021, and the Administrator entered a final order disposing of the administrative complaint on June 7, 2023. Axalta does not dispute that the FAA commenced the administrative proceeding within five years of the spill. Axalta nevertheless posits that the limitations statute required the Administrator to conclude the administrative proceeding within five years of the alleged violation. We see no basis in the limitations statute for Axalta's position. The statute concerns the time in which an administrative proceeding may be "commenced" — not the time in which an already commenced administrative proceeding must be resolved. And the FAA timely commenced the administrative proceeding by filing an administrative complaint against Axalta on March 9, 2021, less than five years after the spill occurred on January 10, 2017. [6]

Axalta next argues that the ALJ erred by (1) declining to dismiss the FAA's administrative complaint for failure to allege the requisite scienter and (2) concluding that the FAA met its burden of proving the requisite scienter. Section 5123(a) of Title 49 to the United States Code provides that a "person who knowingly violates" the HMR "is liable to the United States Government for a civil penalty of not more than $75,000 for each violation." The law further provides that a

---

[6] The limitations period established by 28 U.S.C. § 2462 also governs the time during which the Government may file in district court a civil action to collect a penalty assessed after an administrative proceeding. See United States v. Meyer, 808 F.2d 912, 914 (1st Cir. 1987). Because Axalta does not assert that the Government filed an untimely civil action to collect the Administrator's penalty, we confine our review to the timeliness of the administrative proceeding itself.

"person acts knowingly when . . . (A) the person has actual knowledge of the facts giving rise to the violation; or (B) a reasonable person acting in the circumstances and exercising reasonable care would have that knowledge."  49 U.S.C. § 5123(a)(1).

We are satisfied that the FAA sufficiently alleged, and then met its burden of proving, that Axalta acted with the requisite scienter.  The FAA alleged in its administrative complaint that Axalta offered the paint for shipment by FedEx "when the material was not properly . . . packaged" or "in the proper condition for shipment." J.A. 16, ¶ 5.  This allegation allows the reasonable inference that Axalta had knowledge of the facts giving rise to the alleged violation or that Axalta would have known of these facts if it had exercised reasonable care.

We are satisfied as well that the ALJ's conclusion that the FAA proved the requisite scienter at the hearing is supported by substantial evidence.  Axalta does not dispute that it packed the paint.  And the FAA presented evidence that the paint was not packed in such a way to withstand "conditions normally incident to transportation" under 49 C.F.R. § 173.24(b).  In particular, the FAA elicited testimony from Wayne Knight, an agency investigator, that one of the "retaining clips" used to secure the lid to the paint can had failed, J.A. 223–24, and that, as far as Knight was aware, there was no evidence that the clip failure was due to "a handling problem" attributable to FedEx, J.A. 240.  A reasonable factfinder could conclude on the basis of this evidence that Axalta knew or should have known of the facts giving rise to the violations found by the ALJ.  See Lusingo, 420 F.3d at 199 (defining "substantial evidence" as "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion" (quoting <u>Columbian Enameling & Stamping Co.</u>, 306 U.S. at 300)).[7]

Axalta argues, finally, that the Administrator deprived Axalta of due process by finding it liable for violating a regulatory provision, 49 C.F.R. § 173.27(d), that the FAA did not specifically identify in its administrative complaint. The regulation codified at 49 C.F.R. § 173.27(d) provides, in part, that "[t]he body and closure of any packaging must be constructed to be able to adequately resist the effects of temperature and vibration occurring in conditions normally incident to air transportation." It further provides that "[i]nner packaging or receptacle closures of combination packages containing liquids must be held securely, tightly and effectively in place by secondary means," such as "locking rings." <u>Id.</u>

---

[7] Citing an opinion issued by the Court of Appeals for the Seventh Circuit in <u>National Power Corp. v. FAA</u>, 864 F.3d 529 (7th Cir. 2017), Axalta suggests that the FAA was required under 49 U.S.C. § 5123(a)(1) to "establish that Axalta knew (or should have known) [that] it failed to comply with the applicable regulation." Axalta Br. 30. But the court held the opposite: the court observed that in contrast to the prohibition against "willful" violation of the HMR codified at 49 U.S.C. § 5124(c), which requires "knowledge of the facts giving rise to a violation *and* knowledge that the conduct was unlawful," the prohibition against "knowing" violation of the HMR codified at 49 U.S.C. § 5123(a)(1) "does not require a deliberate or intentional violation of the law." <u>Nat'l Power Corp.</u>, 864 F.3d at 533.

Axalta is correct that the FAA did not specifically identify 49 C.F.R. § 173.27(d) as a source of liability in the administrative complaint. <u>See</u> J.A. 16. Instead, counsel for the FAA first specifically identified the provision as a potential source of liability during his closing argument, in response to a question posed by the ALJ.

Nevertheless, this omission did not deprive Axalta of due process. The FAA alleged in the complaint that Axalta violated 49 C.F.R. § 171.2(e), which provides generally that "[n]o person may offer . . . a hazardous material for transportation in commerce unless the hazardous material is properly . . . packaged . . . as required or authorized by [the] applicable requirements of" the HMR. <u>See</u> J.A. 16, ¶ 8(a). The requirements applicable to a package transported by air are those set forth at 49 C.F.R. § 173.27. <u>See</u> 49 C.F.R. § 173.27(a) ("The requirements of this section . . . apply to packages offered or intended for transportation aboard aircraft."). The FAA's complaint made clear that Axalta's alleged violation concerned the improper packaging of a parcel shipped by air. Axalta therefore received adequate notice of the FAA's claim that it had violated the HMR provisions governing packages offered for air transportation, namely, those codified at 49 C.F.R. § 173.27.

V.

For the foregoing reasons, we will deny Axalta's petition for review.

BIBAS, *Circuit Judge*, concurring.

I join the Court's thoughtful opinion in full. As the majority explains, *Atlas Roofing* binds us. And under its rule, this case involves public rights.

I write separately to point out a defect in the public-rights caselaw, which spans both Article III and the Seventh Amendment. Scholars have long argued that *Atlas Roofing*'s expansive view of public rights is wrong. *See, e.g.,* Roger W. Kirst, *Administrative Penalties and the Civil Jury: The Supreme Court's Assault on the Seventh Amendment*, 126 U. Pa. L. Rev. 1281 (1978). But after *Jarkesy*, the caselaw is also at war with itself. *Atlas Roofing* and its progeny created a test for public rights that dragged the doctrine far from the Constitution's original meaning. *Jarkesy* then announced a return to first principles that put the law on sounder footing theoretically—but it preserved a test for public rights that directly conflicts with those principles. I do not fault the *Jarkesy* Court, which showed commendable restraint by deciding the case without gratuitously overruling precedent. But the result has left us with a theoretical scramble: a public-rights exception that the Founders understood narrowly but that precedents force us to construe broadly.

## I. *JARKESY*'S PRINCIPLES CONFLICT WITH THE *ATLAS ROOFING* LINE OF CASES

Article III entitles Americans to a trial before an independent court. As *Jarkesy* recognized, this rule and the Seventh Amendment contain a limited exception, based in historical practice, for public rights. Yet *Jarkesy*'s stated return to

historical first principles conflicts with the test still required by older precedents that *Jarkesy* left on the books. So we are left with principles pointing one way and a legal test pointing the other.

### A. First principles: Public rights are exceptional, rooted in history

*Jarkesy* announced that "[t]he public rights exception" must remain "an *exception*." *SEC v. Jarkesy*, 603 U.S. 109, 131 (2024). That is because it "has no textual basis in the Constitution." *Id.* Instead, the Constitution's text vests "[t]he judicial Power of the United States" in Article III courts and declares that it "shall extend to all Cases" within those courts' jurisdiction. U.S. Const. art. III, §§ 1–2.

Despite that textual vesting of power, Congress has assigned public-rights disputes to non–Article III officials since the Founding. Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L. Rev. 915, 918–19 (1988). The Founders thus understood that those officials could decide certain cases involving what came to be known as "public rights." *See Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856) (using this phrase). But that exception must not "swallow the rule." *Jarkesy*, 603 U.S. at 131. "The presumption is in favor of Article III courts"—that is, in favor of private rights. *Id.* at 132.

Put the text and the history together, and public rights today should be an exception that "derive[s] … from background legal principles" that informed the original public understanding of Article III's Vesting Clause. *Id.* at 131. Though *Jarkesy* did not expressly limit public rights to the kinds recognized at the

2

Founding, its analysis implied as much. And it hinted that they might be limited to "historic[al] categories" often found in "centuries-old rules." *Id.* at 130–31; *see also id.* at 153 (Gorsuch, J., concurring) ("Whatever their roots, traditionally recognized public rights have at least one feature in common: a serious and unbroken historical pedigree.").

To implement these principles, a court would (1) presume that a cause of action does not involve public rights, unless (2) it fits within the public-rights categories that existed when Article III was ratified.

### B. *Atlas Roofing* defaults to public rights, untethered from history

But precedent tells us to presume the opposite. The problem starts with *Atlas Roofing*, which held that whenever Congress creates "new statutory obligations," imposes "civil penalties for their violation," and tasks the sovereign with enforcing them, the public-rights exception applies. *Atlas Roofing v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977). So any time Congress creates a cause of action enforced by the government, *Atlas Roofing* presumes that it involves a public right.

The Court has since pared back that sweeping rule. First, it carved out an exception in *Granfinanciera*, holding that statutes still involve private rights if they just codify the common law. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60–61 (1989). Then, *Jarkesy* widened the carveout, holding that it applies even when a cause of action does not exactly duplicate the common law. 603 U.S. at 126. If a suit "resembles" or is

"akin to" common-law claims, *Jarkesy* explained, it still involves private rights. *Id.* at 135, 139.

Together, these cases hold that (1) when Congress creates a cause of action enforced by the government as sovereign, then it involves public rights, unless (2) it resembles a preexisting action at common law.

Consider *Jarkesy*. Whatever it said about general principles, the Court did not ask whether the statute addressed anything that looked like a long-recognized public right. Instead, applying *Granfinanciera*, it asked whether the statutory scheme looked like a historical action at common law. *Jarkesy*, 603 U.S. at 134. After finding that the anti-fraud laws affirmatively "target the same basic conduct as common law fraud, employ the same terms of art, and operate pursuant to similar legal principles," the Court was satisfied that they involved private rights. *Id.* Yet that reasoning implies that if the anti-fraud laws had not mirrored a traditional common-law action, then they would have involved public rights—whether or not they looked anything like the public rights known at the Founding.

This approach flips the first principles that *Jarkesy* purported to embrace upside down: It presumes that a cause of action involves public rights. To rebut that presumption, the challenger must show that a statutory cause of action affirmatively resembles a historical action at common law. If he cannot, then into the public-rights bucket it goes. That makes public rights the rule and private rights the exception.

This approach also expands public rights far beyond their historical limits. If anything, it confines *private* rights to historical bounds. To involve private rights, a statutory cause of

action enforced by the government must resemble something on the finite list of traditional common-law actions: fraud, negligence, conversion, and so on. By contrast, the list of novel actions that Congress might create is infinite, from violations of an agency's workplace-safety rules to fines for improperly shipping cans of paint. If Congress enacts anything in the boundless universe of novel actions, the flipped presumption deems it to involve public rights—even if it lies far afield from historical public-rights actions. If we keep presuming, in effect, that every new action involves public rights, we will stretch this exception far beyond the "background legal principles" that *Jarkesy* says should limit it. 603 U.S. at 131.

To be sure, the Court was able to decide *Jarkesy* without cleaning all this up. The *Jarkesy* statute resembled common-law fraud, so *Granfinanciera* "effectively decide[d] th[e] case." *Id.* at 134. Yet *Jarkesy* never flipped the presumption back in favor of private rights. So when cases do not fit so neatly within *Granfinanciera*, like the case we decide today, *Atlas Roofing*'s topsy-turvy framework still controls. In this case and others like it, the caselaw forces us to follow a rule that contradicts *Jarkesy*'s principles.

*Jarkesy*'s incrementalism is understandable because the Court decided that case under the Seventh Amendment, not Article III. *Id.* at 115. While there is only one public-rights test across both provisions, the troubling presumption that *Jarkesy* preserved is much easier to square with the Seventh Amendment. That Amendment requires only that "the right to trial by jury" as it existed in 1791 "shall be preserved," which is arguably consistent with assigning all causes of action that did not exist in 1791 to juryless forums. U.S. Const. amend. VII;

*Markman v. Westview Instruments*, 517 U.S. 370, 376 (1996). But Article III vests "all Cases" within the federal judicial power in independent courts. U.S. Const. art. III, § 2. That phrasing is absolute, making an exception for any novel action far harder to defend.

## II. UNDER THE PROPER FRAMEWORK, THIS CASE INVOLVES A PRIVATE RIGHT

The majority correctly applies the law on the books. But if we were not constrained by precedent, I would take *Jarkesy*'s first principles seriously: Public rights are a limited exception rooted in history. That would mean starting with the presumption that our case involves private rights and thus belongs in an Article III court. To remove it from Article III, the government would bear the burden of showing that this statutory cause of action resembles a public-rights exception known at the Founding, such as a dispute over government benefits, a claim against the public treasury, or a challenge to how the government disposes of its own property. *Jarkesy*, 603 U.S. at 130; Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 567–68, 582 (2007); John Harrison, *Public Rights, Private Privileges, and Article III*, 54 Ga. L. Rev. 143, 163–64 (2019).

This case is nothing like any of those historical public-rights exceptions. In fact, the Founding generation insisted that any time the government deprived someone of life, liberty, or property, it was depriving him of private rights. As a rule, it had to do so through an Article III court. Nelson at 566–69, 626–27. The government is trying to hit Axalta with a hefty civil penalty, depriving it of its property. That does not fall

within a historical public-rights exception, so it should require an Article III court.

Still, I join the majority opinion because *Atlas Roofing* binds my hands.

* * * * *

Taking Article III seriously requires restoring the proper default rule: "[T]he presumption is in favor of Article III courts." *Jarkesy*, 603 U.S. at 132 (internal quotation marks omitted). The government should thus bear the burden of showing that a new cause of action resembles the closed list of historically recognized public rights. Though we must apply the misguided *Atlas Roofing–Granfinanciera* line of cases today, I hope that the Supreme Court will soon take this accreted jumble and order it into a rule that is coherent, consistent, and true to the Constitution's original safeguards.